[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
The trial of Richard B. Tooher and Bruce N. Binns came to a conclusion on July 23, 1986 with the rendition of verdicts by a jury. That jury found beyond a reasonable doubt that these defendants conspired to obstruct justice and did obstruct justice on July 1, 1984. It was also determined by the jury that Mr. Binns was guilty of an assault and battery on Richard Raymond and had filed a false document with intent to deceive a public official. Mr. Tooher was acquitted of the crime of larceny and of filing a false document with intent to deceive a public official. Following the jury's verdicts, the Court entered a judgment of acquittal on behalf of Mr. Binns on the false document guilty verdict. From the judgments of conviction entered against them, the defendants appealed.
After the appeal was argued and while the Supreme Court decision was pending, the defendants filed motions in the Supreme Court asking the court to stay proceedings on the appeal and to remand the matter to this court for an evidentiary hearing on the basis of newly discovered evidence. As part of the factual background for their motions the defendants stated: "The trial court noted that [the defendants'] convictions rested entirely on the testimony of two discharged police officers, Robert Knight and James Williams."
The newly discovered evidence purported to pertain to three trial witnesses; two former Glocester police officers, Robert Knight and James Williams, and Richard Raymond. As to Knight, the defendants "asserted that state police documents discovered after trial further impeach material aspects of Knight's testimony and that the prosecutor failed to disclose to defense counsel a state police requirement concerning log maintenance that, if known, would have lead (sic) to further impeachment of Knight." (Motions for Remand 1, fn. 2) The evidence to be given against Williams and Raymond was to come from two individuals who had conversations with Raymond, namely, Gina Raymond and Richard Bressan. Additional evidence was developed on December 4, 1988 as to Raymond through James Thomas Lancia.
Although the motions for remand contain a number of excerpts of the unsworn and sworn statements given by Bressan and Gina Raymond, what they have to say is capable of summarization. Richard Raymond told them that he had committed many burglaries in the town of Glocester and while he was in the midst of one of them the police came in and arrested him. It is to be inferred that this incident involves the break and entry which eventually resulted in this indictment of the defendants because Richard Raymond also told them that although the items he had stolen were placed in his car by him it was these defendants who were wrongfully convicted of doing so. This miscarriage of justice was accomplished, said Richard Raymond, through the testimony of "a former patrolman (who had been fired by then-Chief Tooher)" (Motions for Remand 2) (presumably Robert Knight) and "a rookie cop" (Motions for Remand 3) (presumably James Williams), both of whom were bent on revenge for their discharges from the Glocester Police Department. The flavor of the newly discovered evidence is probably best captured, with some explanatory editing by the Court, in this remark by Gina Raymond: "The rookie cop [Williams?] is saying [in court] that the other cops [Tooher and Binns] stashed the stuff [in Richard Raymond's car] but my uncle [Richard Raymond] said that he did do the job. He admitted this to me and the stuff that was in the car was the stuff that he had stolen." (Motions for Remand 3)
Noting its pending decision, the Supreme Court denied the motions to remand "without prejudice to the defendants seeking post-conviction relief or other appropriate relief before the Superior Court in the event that their appeal is decided adversely to them." (Order, May 17, 1988)
The convictions of these defendants were affirmed on June 7, 1988, State v. Tooher and Binns, 542 A.2d 1084.
On October 24, 1988, these defendants filed timely motions for a new trial on the ground of newly discovered evidence, as they are permitted to do under our Rule of Criminal Procedure 33. A memorandum of law, which shall be referred to as the "initial memorandum" in this decision, accompanied the motions. A "supplement" to that motion was filed on December 5, 1988 to take into account the additional evidence being submitted through James Thomas Lancia and others. On April 20, 1990, the defendants filed amended motions for a new trial but the grounds of the motions were unchanged. Whenever the Court considers it necessary to refer to the motions for a new trial, it shall be referring to the amended motions.
The evidentiary hearings requested by the defendants or required by the Court came to a close on July 10, 1990. Memoranda of law were called for by the Court in addition to the oral arguments presented through the course of the entire proceedings. On July 25, 1990, the defendants filed a "consolidated memorandum of law." This shall be referred to as the "final memorandum."
The grounds asserted by the defendants in their motions are:
 1. That they made diligent efforts to discover evidence for use at their trial;
 2. That the evidence they have discovered since that time is material and relevant and would probably result in their acquittal at a re-trial, and;
 3. To put it in their own language, that "[e]vidence discovered since the entry of judgment materially alters the credibility and relevance of certain evidence presented at trial and other information known to both the State and the Defendants but not presented at trial."
To prevail on these motions, the defendants have the burden of proving that the evidence they wish to have introduced at a second trial is newly discovered since their convictions; that they were diligent in attempting to discover the evidence for use at their 1986 trial; that the evidence is not merely cumulative or impeaching but material to the issue and be of a kind that would probably change the verdict of another jury. State v.Carsetti, 111 R.I. 642, 306 A.2d 166 (1973). If they are successful to that extent, this Court is obliged to decide whether the evidence they are now relying upon is credible enough to warrant a new trial. Id. In undertaking that exercise, the Court does so by calling upon its independent judgment to assess the credibility of the putative witnesses and the weight to be attributed to what they are expected to tell that other jury.Id.
In the pursuit of their cause, the defendants have been somewhat less than careful in their representation of the facts. As a consequence, in deciding these motions, the Court will find it necessary at certain points to put the facts relied upon by the defendants in their true posture. It was not correct for the defendants to say to the Supreme Court that "the trial court noted that [the defendants'] convictions rested entirely on the testimony" of Knight and Williams. That was an argument made by counsel for the defendants in the course of their motions for a new trial. [Tr. V.7, 2 and 16] The Court specifically rejected the argument:
 "The Court does not agree, however, that the Court must concentrate solely upon the testimony of Mr. Williams and Mr. Knight, because as in all cases, what other witnesses may say for or against a particular issue has to be taken in consideration to determine what to believe and what not to believe. So with that in mind, the Court must consider not only the evidence given by Mr. Williams and Mr. Knight, but the testimony of all of these witnesses." [Tr. V.5, 1143]
And in this court, at the very threshold they misstate what the obstruction of justice charges are all about. They say: "The State charged that Defendants, concerned because Officer James Williams had beaten [Richard] Raymond, had conspired to strengthen the evidence against Raymond (by planting evidence in Raymond's car and by obtaining a pastdated warrant to legitimatize Raymond's arrest shortly after midnight on July 1, 1984) and thereafter had sought to conceal the affair by inducing Raymond to execute a general release." (Motions, 2) While the evidence may support a statement that Williams had beaten Raymond, that was not the concern which led to the criminal conduct of the defendants. Only one witness reproduced the words which are most likely the basis of their convictions for conspiracy and obstruction of justice and he was Robert Knight. What he told the jury had nothing to do with Williams and everything to do with the defendant Binns. Knight testified: "As I walked into the house, the lieutenant [defendant Binns] was saying to the Chief [defendant Tooher] that he didn't think this case was going to fly . . . and he stated that he didn't need another lawsuit against him at this time." [Tr. V.2, 266-267] Asked if that was all he heard Binns say in the Ronci house that night, he answered: "Yes, sir." [Id. 268] Incorrectly interpreting the motivation for the defendants' conspiracy to their concern for the beating Williams administered to Raymond is not an inadvertence. The defendants say, at page 8 of their initial memorandum: "The State presented the jury with the theory that Defendants, fearing civil liability and other repercussions after Officer James Williams had beaten Richard Raymond and Raymond had complained of serious injuries, had conspired to plant evidence in Raymond's car. . .". The defendants repeat this misstatement verbatim on page 10 of their final memorandum. In at least four other instances, the defendants speak about Williams beating Raymond and it is difficult for the Court to comprehend the reasons for these varied allusions since it was Binns who was found guilty of hitting Raymond in the back with a club and not Williams. If the argument which the defendants appear to make in seeking a new trial has any validity at all, it would be just as valid and more fair to the Court if they were forthright in facing Binns' conviction on the battery count, wrong though they might think it to be, for what it is.
On the heels of those initial misrepresentations, the defendants quote the Court as characterizing the trial testimony as "close" and cite to the trial record. (Motions 2) (Final memorandum 11) Neither on the cited pages of the transcript nor anywhere else in that decision on defendants' motions for a new trial did the Court use the quoted language. And while it is accurate to say that the Court used the words "very, very suspect" in commenting upon Knight's testimony, the defendants have ignored what came before those words and what came after them.
Following the convictions of these defendants, the Court passed upon their motions that they be granted a new trial. With the assumption that Knight's testimony played a large part in the jury verdicts, the Court was obliged to pass its independent judgment upon Knight's credibility. In doing so, the Court noted that the evidence which Knight had given before the grand jury was such that it could cause the trial jury to discredit his statement that he had heard these defendants engage in this conspiracy. At that point in its decision the Court said because of that grand jury testimony: "* * * of course his testimony [given at the trial] becomes very, very suspect. But before one is ready to reject it, they must look at all of the testimony." [Tr. V.5, 1149] And in so doing, the Court subsequently asserted that Williams' testimony "becomes suspect" [Id. 1150] and that defendant Tooher's testimony "becomes suspect". [Id. 1158] The Court did not say that Knight's testimony was untrue but that it was in a state in which the jury could have found it to be untrue — which it apparently did not. Conversely, the "suspect" testimony of defendant Tooher was apparently found by the jury to be untrue. The point to be made here is that in deciding the motions for a new trial the Court reviewed all of the material testimony and then made it plain that it was not persuaded on the totality of the evidence that the defendants had been found guilty on a measure of evidence which was anything less than beyond a reasonable doubt [See Id. 1162] For the defendants to put words in the mouth of the Court and to take its words out of their context is, at the very least, disingenuous.
 I. The newly discovered evidence concerning Robert Knight.
The defendants implicitly reveal in these motions that the testimony of Robert Knight must be undercut if they are to succeed in getting their case before another jury. An analysis of the evidence and the argument they rely upon to succeed in that effort succeeds only in laying bare the infirmity of their position and the loose manner with which they deal with the facts.
The evidence they desire to offer can best be scrutinized by setting out the pertinent part of Knight's testimony of record. The testimony which surrounded the conspiritorial conversation between the defendants is this:
 "Q. After that, [meaning after Knight left the Raymond automobile at the Chepachet state police barracks] did you return to the station?
 "A. It was later on that morning I returned back to the station.
 "Q. Your usual shift ended at 2 A.M.?
 "A. Yes it did.
 "Q. Sergeant, did you see lieutenant Binns in the company of Chief Tooher at any time after you dropped the car off at the state police barracks?
 "A. Yes, I did.
 "Q. Where did you see them?
 "A. They were at the Glocester police station.
 "Q. Did you see them at any other place?
 "A. Yes, they left the Glocester police station in the chief's vehicle and went back to the Ronci residence.
 "Q. And did you see them inside the Ronci residence?
 "A. Yes, I did.
 "Q. Were you with them?
 "A. Yes, I was.
 "Q. What time was this in relation to the time you dropped the car off at the state police barracks?
 "A. Was later that morning, I can't recall the exact time.
 "Q. Was it after sunrise?
 "A. It was right around that time."
 [Tr. V.2, 264-265]
The defendants developed the following in cross-examination:
 "Q. Do you recall the time that the Raymond vehicle was towed [to the Chepachet state police barracks] from the Davis trailer park?
 "A. It was sometime after 12:30 I believe.
 "Q. Was it before one o'clock?
 "A. I couldn't say exactly the exact time it was towed.
 "Q. Well, I'm not asking you for the exact time. Was it before one o'clock?
 "A. I believe so. I can't be exactly sure.
 "Q. Now your normal tour of duty would have ended at two?
 "A. Yes.
 "Q. Is that so? What did you do after the vehicle was towed to the Chepachet state police barracks?
 "A. I believe I stayed in the barracks for a while and talked to some of the officers there.
 "Q. At the state police barracks?
 "A. Yes, sir.
 "Q. How long did you stay there?
 "A. I'm not exactly sure; it was a while, though.
 "Q. When you say a while, could you give us an idea?
 "A. It could have been an hour, could have been two hours.
 "Q. Was it until sunrise?
 "A. No, sir.
 "Q. After you left the Rhode Island state police barracks, where did you go?
 "A. Back to Glocester police station."
 * * *
 "Q. What time was it, in your best recollection, that you got back to the Glocester police station?
 "A. It could have been, it was sometime after 2 or 3 o'clock."
 * * *
 "Q. Your best recollection, what time was it?
 "A. I can't recall. I know it was after two o'clock.
 "Q. Was it before 2:30?
 "A. I don't recall.
 "Q. Was it before 3 o'clock?
 "A. I don't recall.
 "Q. Was it after three o'clock?
 "A. I stated I'm not sure what time it was.
 "Q. Was it around sunrise?
 "A. It was before sunrise, I know that."
 [Id. 293-295]
Earlier in cross-examination, the defendants had elicited this:
 "Q. The night of June 30th, 1984, the early morning hours of July 1 of '84, you say you went to the Ronci residence along with the chief and lieutenant Binns?
 "A. Yes, sir.
 "Q. Were you riding along with them?
 "A. No, sir.
 "Q. How did you get there?
 "A. I had my own cruiser.
 "Q. And what time was it, to your best recollection?
 "A. It was early in the morning.
 "Q. Well, how early was it?
 "A. It was around sunrise. Would have been 5:00, 5:30, some time around there.
 "Q. So when you say around sunrise, I assume you mean the sun was coming up?
 "A. Well, it came up some time after that time."
 [Id. 276-277]
With this evidentiary background, the Court will repeat in detail what it is that the defendants wish to present to another jury about Robert Knight and why they believe the Court should permit them to do it. The Court quotes from pages 13 and 14 of the initial memorandum which the defendants have submitted in support of their motions. These quoted excerpts are repeated, except with two minor variations, verbatim under item 5 of defendants' final memorandum. They appear therein at pages 18-20.
 "Although Knight told a grand jury that he went home at the end of his tour of duty at 2:00 a.m., he subsequently told investigators that he followed Defendants to the Ronci residence shortly after 2:00 a.m. and overheard their discussions of methods to unlawfully improve the evidence against Richard Raymond. At trial, for the first time, Knight told a third story. He surprised Defendants' counsel with his assertion that he had spent a long time — possibly one or two hours — at the Rhode Island State Police Chepachet Barracks and followed the Defendants to the Ronci residence shortly before sunrise."
If Knight told investigators anything at all about the defendants after he testified before the grand jury, his statement to the investigators has not been submitted to the Court for review. Be that as it may, the trial testimony being that he went to the Ronci home "five, five-thirty somewhere around there", his statement to the investigators that he went there "shortly after 2 a.m.", if of any value at all, is simply additional impeaching evidence. At most, it says nothing more than he went there at a different time. That certainly is not as damaging as his admission to the trial jury that he had told a grand jury under oath that he went home after his tour of duty. From that admission the jury could have decided that Knight never went to the Ronci house at all — not shortly after two, not about five or five-thirty, nor around sunrise — and hence was not present to hear the defendants say anything. The jury had further reason to believe that Knight went home and not with the defendants. Williams testified that he heard Knight call in after three o'clock that he was going off duty. [Tr. V.1, 189] The Court suspects that the statement made to investigators to which the defendants are referring, which one might call the "second story", is a statement which Knight made on May 6, 1986. If that is so, the Court will have more to say about it later in this decision.
The Court has no means to know whether counsel for the defendants was surprised by the "third story". But as the Court will later recount, defense counsel and the defendants had the means and the time to regain their composure and meet that "third story" if they felt it in their interest to do so.
 "Police department, fire department, and hospital records, as well as the testimony of several witnesses, all establish that Knight could not have followed Defendants to the Ronci home shortly after 2 a.m., where Defendant Binns and rescue personnel had accompanied Richard Raymond to Fogarty Hospital shortly after 2:30 a.m. In fact, no witness at trial identified Knight as appearing at the Glocester Police Station or anywhere else after 2:00 a.m."
Again defendants refer to records and testimony which have not been presented to the Court for its review. It is not the office of this Court to grant the defendants a new trial on their mere assertion that they are able to establish that Knight can be contradicted. For the Court to discharge in a proper fashion its obligation under Carsetti, supra, it must be provided with the specific evidence itself and not with just what the defendants think the evidence will establish.
The Court is certain that the fact that "no witness at trial identified Knight as appearing at the Glocester Police Station or anywhere else after 2:00 a.m." was not lost on the jury. In addition, the jury had the affirmative testimony of the defendant Tooher, who had said that he came to the Glocester police station in the vicinity of two o'clock, that he did not see Knight at any time that night. [Tr. V.4, 851] And if that evidence was not enough, David Piccirillo told the jury that he had a specific recollection — not that he believed or that he thought but that he had a specific recollection — that Knight "wasn't [at the station] after 2 a.m." [Tr. V.3, 750]
 "Although the State produced the `daysheets' of the Rhode Island State Police Chepachet Barracks during discovery, the State did not move for the admission of this document at trial and did not question the officer producing it at trial about its content."
The State was under no duty at trial to move the admission of the state police daysheets or to question the officer who produced them about what they contained. The State's burden was to prove guilt and what evidence it introduced to do so was its own concern. The state police daysheets were described by Gary Treml, the officer who brought them into court, as "a list of times or a log of times." [Tr. V.2, 332] There was nothing covert or mysterious about the fact that he did not testify from the records or that they were not introduced into evidence. On the contrary, the prosecutor pointedly stated: "Your honor, may the record reflect I'm going to hand the witness back the two documents he just handed me, the time sheets and the complaint to which he's earlier referred. State makes no motion or effort to have any of the documents marked." [Id. 332-333] If defendants did not know what was going on at that point, they could certainly have found out. The prosecutor's statement alone should have piqued their curiosity. Nevertheless, as the Court has already said, the defendants' knowledge of those daysheets and the effects of that knowledge will be developed in tandem with the defendants' contentions.
 "At no time did the State advise Defendants' counsel that, unlike every other law enforcement agency in the state which maintains a similar log, the Rhode Island State Police requires that troopers enter the time of arrival and departure of all persons (including troopers, officers from other agencies, and all other visitors) entering the barracks on the daysheet."
Even if it were true that the department of state police maintains its time log "unlike every other law enforcement agency in the state which maintains a similar log", that fact would impose no obligation on the state to advise the defendants of it — unless the defendants are suggesting some distorted but unexplained version of what constitutes exculpatory evidence. Later on in their argument the defendants describe the procedures which the state police employ in keeping a time log as "unique procedures". The truth is that the state police procedures are neither "unique" nor "unlike every other law enforcement agency in the state which maintains a similar log." Defendants' assertions of this kind — not found in fact — border on the reckless.
The very first witness presented by the defendants was the interim chief of the Glocester police department, Robert J. Witherspoon. On the basis of his testimony, the day sheets of the Glocester police department for June 30 and July 1, 1984 were received into evidence as exhibit A. The papers in the files of this case reveal that on April 28, 1986, the state mailed to counsel for the defendants its answers to defendants' motions for discovery. Item 4i. of those answers is described as "Glocester Police Department Day Sheets dated Saturday, June 30, 1984 and July 1, 1984." Item 4j. is described as "Rhode Island State Police Day Sheets dated Saturday, June 30, 1984 and July 1, 1984." Item 4i. and exhibit A, the Glocester day sheets in evidence, are identical. Submitted by the defendants in support of the motions now before the Court is the deposition of Joseph Osediacz of the Rhode Island State Police. Incorporated into his deposition are the state police day sheets for Saturday, June 30, 1984 and for Sunday, July 1, 1984 which are identical to those days sheets which were mailed to counsel for defendants as item 4j. Even a cursory comparison of the Glocester and state police day sheets then in the possession of the defendants show that they both record "the time of arrival and departure of all persons." The Court cannot say whether all city and town police departments employed the same method of recording the daily activity within their police stations but, so long as Glocester did it, it cannot be said that the state police method is either "unique" or "unlike every other". If the defendants were not aware of the state police methodology at trial, they should have been. They should have been alerted to the recording practice by item 4i. which they introduced as exhibit A. All they need to have done then was to look at item 4j. This is not a minor point and the Court proceeds to develop it further.
 "Thus, the absence of any reference to Knight on the state police daysheet, admissible under Rule 803, R.I.R. Evid., is material and dispositive of an essential element of Knight's `smoking gun' testimony, and it, coupled with other trial testimony and knight's prior statements, allows of only a single, reasonable inference: that Knight went home at 2:00 a.m., before Raymond first complained of any injury."
Since the defendants do not specifically identify "an essential element of Knight's `smoking gun' testimony" which the state police day sheet of July 1, 1984 may have an effect upon, the Court assumes that the reference is to his presence at the Ronci home when the defendants' conspiracy evolved. It should be patent that proof that Knight did not even appear in the Chepachet barracks that morning does not create the single inference "that Knight went home at 2:00 a.m." The issue here is not whether he visited at the barracks but whether he was at the Ronci home "around sunrise." What the purported evidence "that Knight went home at 2 a.m." would have permitted the trial jury to do had such testimony been presented to it would have been to conclude that his testimony about spending time at the barracks was not the truth, that he was not a credible witness and that his story about the conspiracy was not to be believed. It is impeaching evidence on a collateral matter and at the same time cumulative because the trial jury heard Knight admit that he had previously told a grand jury that he had gone home. Given the fact that he also stated that his shift ended at two a.m., the trial jury had evidence which would have supported a judgment that he went home when his shift ended and was not at the Ronci house to hear the defendants. In this respect, the preferred evidence, described as "material and dispositive", adds nothing new to the case.
 "Further corroborating this inference is the deposition testimony of Sergeant Joseph Osediacz (state police night inspecting officer on the morning of July 1, 1984) and Trooper Robert Jacobs (the sole officer assigned to the Chepachet Barracks on that morning). Both of these officers have now testified that Robert Knight never entered the state police barracks or spoke with them on the morning of July 1, 1984. Defendants' counsel has now interviewed all of the other troopers on duty in the Chepachet and Scituate patrol areas between 9:00 p.m., June 30, 1984 and 8:00 a.m., July 1, 1984 (Troopers Pontarelli, Treml, Mousseau, and Schneider), and each of these troopers will testify that they had no contact with Knight after the arrest of Richard Raymond and the towing of his vehicle.
 "This evidence meets the Rule 33 standard. The documentary evidence and the testimony of the troopers (supported by late patrol reports and other state police documents) directly contradicts an essential component of Knight's trial testimony. This contradiction, Defendants submit, is sufficient to tip Knight's already `very, very suspect' testimony into the noncredible column. If Knight repeated his trial testimony at a new trial, six state troopers would contradict it. If Knight changed his testimony for the fourth time, there would be little need to contradict it."
In their initial memorandum the defendants represented to this Court that six state troopers would contradict Knight if he repeated his testimony to another jury and that "[t]his contradiction . . . is sufficient to tip Knight's already `very, very suspect' testimony into the noncredible column." The officers referred to are Sergeant Joseph Osediacz and Troopers Treml, Pontarelli, Jacobs, Mousseau and Schneider. In their amended motions, Mousseau and Schneider were excluded from the group. They again became a part of the sextet in the final memorandum. The Court will deal with the assertions as originally and finally submitted. Considering the heavy reliance of the defendants on the state police daysheet for the period between nine p.m. on June 30, 1984 and eight a.m. on July 1, 1984, the Court can say with certainty that "[i]f Knight repeated his trial testimony at a new trial, six state troopers" could not "contradict it."
According to the state police day sheets sent to counsel for the defendants, four of the six arrived at the barracks at 9:40 p.m. for late patrol. Trooper Treml arrived five minutes later for the same purpose. At 10:20 p.m., Trooper Jacobs, the last of the six, took over the office for the night. That entry is corroborated in his deposition testimony of May 12, 1988. [7] Schneider and Mousseau left to patrol their area at 10:28 p.m. and did not return until 8:15 the next morning. They are in no position to testify at all about Knight's activities at the barracks. It is of course true that they could "testify that they had no contact with Knight after the arrest of Richard Raymond and the towing of his vehicle" because, on the record as a whole, they were never in a position to see Knight at anytime, let alone after Raymond's arrest and the car towing. Besides, whether they and Pontarelli and Treml had any "contact" with Knight is not the question. The question is: did Knight visit the barracks for "one or two hours?" Given the undisputed fact that Schneider and Mousseau were away from the barracks when Knight is alleged to have been there, these two troopers cannot answer that question before a jury.
Pontarelli and Treml left for late patrol at ten-thirty p.m. and became involved in this case both as police officers and as witnesses at the trial of the defendants. They returned to the barracks at two o'clock to work on the arrest papers. While there, Pontarelli received a request for permission to have the Raymond vehicle parked behind the barracks which request he granted. [Tr. V.2, 385] Sergeant Osediacz came in to the barracks at two-twenty a.m. while Pontarelli and Treml were still on the premises. He was still there when Pontarelli and Treml left the barracks at two-forty-five a.m. and he himself left ten minutes later. In his deposition testimony of April 25, 1988, Osediacz confirmed his arrival and departure times. [6] He did not return to the barracks that morning. Pontarelli and Treml were not again on the premises until seven-twenty a.m., well after sunrise. Hence, between midnight and seven o'clock on the morning of July 1, 1984, those three officers were at the barracks for an aggregate period of fifty-five consecutive minutes. None of them can testify whether Knight was at the barracks between twelve-thirty and two or between two-fifty-five and seven-twenty a.m. on July 1, 1984.
Only one officer — not six — is in a position to know whether Knight spent any other time at all at the barracks and he is Robert Jacobs who was present at the barracks from the time he arrived until his tour of duty was over at eight-forty-five a.m. And even he did not and cannot say that he did not see Knight at the barracks. At best, he could testify as he did at his deposition that Knight's name does not appear on the day sheet and that, because of that fact, it is "a safe bet that he wasn't there that evening." [5, lines 15-24] Among the more flagrant misrepresentations of fact used by the defendants in their endeavor to have this Court grant them a new trial has to do with the depositions of Trooper Jacobs and Sergeant Osediacz. Speaking of their depositions, the defendants state categorically: "Both of these officers have now testified that Robert Knight never entered the state police barracks or spoke with them on the morning of July 1, 1984." Nothing could be more divorced from fact. Jacobs said nothing of the kind. He was never asked that question. The import of his entire testimony is that since there is no entry on the day sheet that Knight was in the barracks, it is a "safe bet" that he was not. Osediacz's testimony is even more restrictive. Asked "Did you see Robert Knight at the Chepachet Police Barracks during the time you were there on the morning of July 1, 1984?" he answered, "No, sir, I did not." [6] (Emphasis added.) This testimony of these proposed witnesses is a far cry from their saying that Knight "never entered" the barracks.
 "Defendants submit that this evidence was unavailable to Defendants at trial. As noted, although the State produced the state police day sheet, Defendants were never advised of the procedures for maintaining this document, despite the unique procedures followed by the state police. More importantly, the State surprised Defendants with Knight's trial testimony. Until Knight took the stand, Defendants and their trial counsel had no knowledge of Knight's claim to have spent time at the state police barracks. The State had listed the state police day sheet as an exhibit, and the State had indicated its intention to call Troopers Pontarelli and Treml as witnesses. Defendants' counsel could reasonably assume that the State would not present Knight's testimony if it could be contradicted by its own witnesses. Further, without the knowledge that he would get a negative answer, Defendant's trial counsel could not take the risk at trial of asking Trooper Pontarelli or Trooper Treml whether they had indeed spent time at the barracks with Knight."
The defendants take the position, as they certainly must, that these prospective witnesses and these "unique" day sheets, all of which they aver will tip the scale of credibility against Robert Knight at a new trial, were not available at trial. Before proceeding to determine whether they have met their burden of proving that, some of their asides deserve comment.
Whereas their earlier view was that it was Knight who surprised defendants' attorney with his "third story", that view has shifted in this fashion: "More importantly, the State surprised Defendants with Knight's trial testimony." Nothing in the trial record and nothing presented by the defendants in the instant proceedings supports this latest claim. The opposite is true. In direct examination, the closest that the state approached this subject was in asking Knight what he did after towing the car to the barracks and his replying: "I returned to the — I'm not exactly sure. I think I stayed in the area for a while out in the vehicle and then I returned back to the police station later on." [Tr. V.2, 261] Not until Knight was asked in cross-examination "What did you do after the vehicle was towed to the Chepachet state police barracks?" did he tell the jury the "third story." [See Id. 293] The defendants may have been surprised by that testimony but it came out in cross-examination and was not volunteered by Knight on direct. So that when the defendants say that they could reasonably assume that Knight's testimony as presented by the state would not be contradicted by Pontarelli and Treml they are entirely correct because the state never presented any testimony that Knight spent time at the barracks — testimony which Pontarelli and Treml conceivably could contradict for the forty-five minute period during which they were at the barracks. There is nothing in the trial record from which it can be said that the state knew that Knight spent any time at the barracks. Consequently, the presentation of Knight, Pontarelli and Treml by the state was no cause for the state to be concerned that Knight would be contradicted. Nor was there any reason, as defendants intimate there was, at footnote 18 on page 20 of their final memorandum, for the prosecutor or any of the attorney general's investigators to interview any member of the state police with respect to Knight's account of his whereabouts on the morning of July 1. As will soon be pointed out, the state had as much reason to be surprised by his testimony as the defendants purport to have been.
The Court comes now to its analysis of the evidence on the basis of which it finds that the evidence which the defendants wish to present to another jury — "evidence provided by Rhode Island State Police Documents and Officers" [Initial Memo, Item IIIC, 13; Final memo, Item B5, 18] is neither newly discovered nor newly available.
It was a Friday morning, July 11, 1986, that Robert Knight "surprised" the defendants with his "third story." At that moment, the defendants had in their possession, one would assume, the state police daysheets for June 30 and July 1, 1984. The Court so assumes because those day sheets were mailed to defense counsel on April 28, 1986, seventy-four days before Knight's disclosure. There can be no doubt that counsel received them because the Glocester day sheets were mailed at the same time and were submitted by defendants as exhibit A. It is readily apparent from the day sheets that they reflect the coming and going of others beside state police personnel. As examples, on June 30, a National Guardsman came in to use the telephone, Carlton Round came in at 5:15 p.m. and left at 5:42 p.m., Mr. Mulligan came at 8:54 p.m. and left thirteen minutes later. If the defendants did not realize the impeaching nature of the July 1 day sheet at the moment Knight spoke, they had a great deal of time to come to that realization and remedy the situation. This opportunity presented itself in the cross-examination of the witness who immediately succeeded Knight that morning, Gary Treml. It was he who brought the state police day sheets into the courtroom and to whom they were ceremoniously returned by the prosecutor without examination. The defendants then had the opportunity, if they wished to avail themselves of it, to have the sheets marked for identification and proceed to inquire into them. The Court cannot say what course its rulings would have taken if defendants then and there offered to show the lack of Knight's presence at the barracks. But since the state had established what the documents were, [Tr. V.2, 332] development of that subject in cross-examination would have been proper. And it can be remarked with certitude that if the defendants felt it beneficial to their cause, they had it within their power to marshall all the evidence for presentation at the trial that they now seek to offer to cast doubt upon "an essential element of Knight's `smoking gun' testimony."
The six state police officers they wish to call as witnesses were all available during the trial. The information they are prepared to give to another jury is information they were capable of giving the trial jury. Keeping in mind that when Knight testified on July 11, 1986 the defendants had the state police day sheets in their possession, they had ample time thereafter to develop the evidence for submission to the trial jury. Six days elapsed between Knight's appearance on July 11 and the opening of the defendants' case to the jury on Thursday, July 17. In the meantime, there were no court sessions on Friday afternoon, July 11, on the succeeding weekend, on the afternoon of Monday, July 14 and on the morning of Tuesday, July 15. A weekend intervened between the defendants' opening and the day they rested, Monday, July 21. At no time during the period July 11 to July 21 was the Court informed that they sought to prepare witnesses to meet Knight's testimony and were not able to do so. It is to be assumed that at least Jacobs, Osediacz, Pontarelli and Treml could have shed some more reliable light on the events of the morning of July 1, 1984 had they testified at the 1986 trial rather than at a trial today. And as to those four, to repeat, only Jacobs is competent to testify that Knight was never in the barracks and he may do so only on the basis of the accuracy of his own record keeping. Even at that, had the defendants utilized the day sheets only to the extent that the sheets reflected the barracks activity on the morning of July 1, they could have argued to the jury as they did with exhibit A, the Glocester day sheets, that the state police day sheets are "a record kept in the ordinary course of business [and] that the entries are made at or near the time indicated" and that there was "no indication that . . . this document is in any way anything but the truth." [Closing Argument, Tr. V.6, 17]
This evidence is not only neither newly discovered nor newly available but, in addition, its function is to impeach a witness who was substantially impeached at trial. Even worse, this evidence is designed to impeach on a collateral matter. (See
State v. Bowden, 439 A.2d 263, 268 (R.I. 1982)) The critical question was not whether Knight spent an hour or two at the barracks. Discrediting that testimony attacks his general credibility. The critical question at trial was whether he was at the Ronci house. That is where the defendants concocted and carried out an obstruction of justice. As to that testimony, the defendants used his grand jury testimony to show the jury that Knight previously said that he went home at the end of his shift.
When the Court said earlier that the state had as much reason to be surprised by Knight's testimony as the defendants say they were, it had in mind an answer given by Knight to an investigator for the state. In giving a statement on May 6, 1986, he was asked precisely the same question which prompted his "third story" during cross-examination: "What did you do after the vehicle was towed to the state police Chepachet barracks?" His response: "I returned to the Glocester Police Station because it was nearing the end of my shift which was 6 p.m. to 2 a.m."
The Court refers to that disclosure in part to illustrate that the state could reasonably expect Knight to answer the cross-examiner's question as he answered the investigator's question and that his "third story" was neither known nor expected by the state. The more significant aspect of the May 6th response is that defendants knew before trial that Knight had been asked that question on May 6, 1986 and that he answered it at trial on July 11, 1986 with a new version. Knight's entire statement of May 6, 1986 was mailed to the defendants' counsel on May 16, 1986 as an attachment to "State's Supplemental Answer to Defendant's Motion for Discovery and Inspection." Had defendants chosen to use it, they could have confronted Knight while he was still in the jury's presence that just more than two months before that time he had said that he went directly to his station and not into the barracks. If the testimony of the state police and the state police day sheets are admissible to show that Knight spent no time at the barracks, then defendants had an even more effective means to contradict him immediately with his own words. Had that been done at the trial, the defendants would have accomplished everything they wish to accomplish now insofar as Knight is concerned. Acquainting the trial jury with his prior inconsistent statement of May 6th would have obviated any need for the cumulative and impeaching evidence which they wish another jury to hear. And the same can be said about the testimony which James T. Beck and Dennis Taber say they are prepared to give in keeping with their affidavits of June 23, 1987.
In sum, insofar as Robert Knight is concerned, assuming that the evidence which the defendants wish to use against him at a re-trial is admissible at all, it is both evidence which they had in their hands at their trial and which was capable of leading them to additional evidence. Their choice not to use it is not hard to fathom. They recognized that the inconsistent and discrediting testimony which Knight had given to the grand jury was powerful enough to create a reasonable doubt. [See closing argument, Tr. V.6, 15-18] Having failed with that strategy, the defendants here ask for an opportunity to try again.
Before proceeding to the next contention, the Court notes a point about witness James Williams and it does so here because it relates to Robert Knight as well. Early in their motions the defendants say: "Two discharged police officers, James Williams and Robert Knight (whose immunized status was never disclosed to the jury) testified with grants of immunity . . ." If Knight had been granted immunity, it had not been granted by the Court. Defendants reveal that the immunity was granted by an agreement which Knight entered into with the Attorney General. (Final memorandum 4) They go on to say that neither the State nor the Defendants made the jury aware of Knight's immunized status. (Final memorandum, 4, fn. 1) While it is true that the jury was kept ignorant of Knight's status, it is not true that Williams' immunized status was not disclosed to the jury. The jury was informed of the benefit accorded to Williams in re-cross-examination. [Tr. V.2, 234] It is difficult for the Court to divine what purpose is served by these allusions to the protection against prosecution enjoyed by Williams and Knight. It is all the more puzzling when one considers the fact that both witnesses had entered into written agreements with the Attorney General in return for their testimony and that the defendants, who were provided with copies of the agreements weeks before trial, decided not to inform the jury of the price that Knight and Williams had exacted.
 II. The newly discovered evidence from Richard Bressan and Gina Raymond.
The next phase of defendants' motions involves evidence, again newly discovered, in the possession of Gina M. Raymond, a niece of Richard Raymond, and Richard M. Bressan, Gina's boyfriend and the father of her two children. The defendants have summarized the evidence to be given by Gina Raymond and Bressan as admissions made to them by Richard Raymond that:
 "He indeed committed many burglaries of homes in Glocester;
 "He was surprised and was apprehended during one such burglary;
 "He placed stolen items in his vehicle but escaped the consequences because police officers were accused of planting the evidence."
 (Motions, 3-4)
Of what consequence the number of burglaries committed by Raymond in Glocester has to the issues in this case is difficult to comprehend. Not content with the injection of that irrelevancy, the defendants proceed to this fatuous argument: "Police records in Glocester corroborate the boasts of multiple burglaries made by Richard Raymond to Gina Raymond and Richard Bressan. At Defendants' counsel's request, Chief (of the Glocester Police Department) Green checked crime reports for the first six months of 1984 and found a significant increase in burglaries for the period immediately prior to Richard Raymond's arrest on June 30, 1984." [Initial memorandum 10; final memorandum 15] It would have been better had such an inanity been omitted, let alone repeated, but, having been included, is best ignored.
In similar vein, it is an ironic perversion of the evidence for the defendants to say that Raymond "placed stolen items in his vehicle but escaped the consequences because police officers were accused of planting the evidence." The defendants, and the defendants alone, are responsible if Raymond has "escaped the consequences" of his crime. They traded the prosecution and certain imprisonment of Richard Raymond for what they mistakenly thought would be a shield against their own civil liability. When the defendants prevailed upon Raymond to sign the general release in August, 1984, no one could possibly have imagined that eighteen months later the defendants would be indicted for events occurring on the night of June 30 — July 1, 1984. The defendants would more than likely have escaped the consequences of their plot had they permitted the prosecution of Richard Raymond to take its course. The Court confesses that it makes these observations reluctantly but the irresponsible nature of such an assertion by the defendants cannot be ignored. Having dealt with the matter, the Court proceeds.
It seems fair to say that the testimony which the defendants wish Bressan and Gina Raymond to give at a new trial is virtually identical. Consequently, the Court will refer to it, when the context permits, as the "Bressan evidence." Where necessary, the court will attribute specific testimony to the specific witness. Brief mention must be made of the manner in which the Bressan evidence came to light.
On April 13, 1988 a convenience store clerk was the victim of an armed robbery. Bressan was present when Richard Raymond, displaying a "Rambo" knife to the clerk, forced the clerk to turn money over to Raymond. Shortly thereafter, Bressan told Gina what had occurred. She telephoned Sergeant Harold J. Marzini of the Woonsocket Police Department and told him anonymously that "I overheard Richard Bressan and Richard Raymond saying that they did the Dairy Mart robbery." [Her sworn statement, April 28, 1988, 30] Whether the police pursued this information is not clear. It is undisputed, however, that by April 18, 1988, Bressan brought to the attention of the police that Richard Raymond "told me that a rookie cop had come to see him and that he wanted to get even with two cops that had him fired. Raymond told me that they got together and he was going to fight the case with Raymond and he would get his job back or revenge." [Bressan statement, April 18, 1988.] That statement revealed that the "cop" was from Glocester. Since both Bressan and Gina Raymond make numerous references to a "rookie cop" without naming the person, this is an opportune point to say that at a hearing before the Court on December 6, 1988 the defendants identified the individual as James Williams. Even without such an identification the inference would be inescapable from the trial testimony that the only rookie on the Glocester police force on June 30, 1984 was Williams.
That brief reference to Richard Raymond has produced a multitude of statements, sworn and unsworn, from Bressan and Gina Raymond. In essence, what they say Richard Raymond has told them is that he burglarized the Ronci home and that the items which defendant Binns and officer Hainsworth found in the Raymond vehicle were placed there by Raymond and not by the defendants. Richard Raymond is also reported to have said that he was expecting to receive $50,000 from the civil rights suit then pending in federal district court and that Williams, disgruntled and driven by revenge because the defendants had fired him, was going to help him get that money. The Court has been informed that the federal action has been settled for $25,000. [Final memorandum, 17, fn. 16.]
The defendants appear to stake a great deal on a linkage between Williams and Raymond. As far as the Court can discern, the defendants proffer this purported connection as some pre-existing nefarious plot designed to result in vengeance for Williams through the convictions of the defendants and for financial reward to Raymond through a fraudulent civil rights action. The argument is illusory and because it distorts the focus upon the real issues it ought to be dispelled before considering those issues. The Court attempts to do so by relying on the facts.
The trial jury had every reason to believe that Williams took the witness stand harboring a grudge and intending to settle a score. The jury was told that defendant Tooher (a) suspended Williams with pay (b) testified before the grand jury which indicted Williams (c) suspended Williams without pay. That certainly laid Williams' bias bare even had he tried to mask it, which he did not. [Tr. V.1, 134] But the bias would permit the jury to discredit Williams' testimony only as that testimony had to do with the defendant Tooher. Nothing in the evidence would support any taint of ill will in Williams' testimony against defendant Binns. The role played by Williams in this trial is not to be obscured. His functions were to support the counts in the indictment which accused defendant Tooher of larceny, the defendant Binns of assault and battery and each of them of filing a false document. His testimony on the obstruction of justice charges was tangential at best — confined to his examination of the interior of the Raymond automobile. And that was more than offset by his testimony, which the jury could have used to find that Knight was not in the presence of the defendants at the Ronci house, that Knight called in at 3 a.m. that he was going off duty.
The Court recognizes that speculation is inherent in any attempt to explain how any jury arrived at a verdict. Nonetheless, the inference is strong here that in this case the jury used Williams' grudge against the defendant Tooher to acquit that defendant of larceny and filing a false report. On the other hand, one might plausibly argue that the jury convicted defendant Binns of assault and battery and of filing a false document on the basis that Williams' testimony against him was free of rancor or animosity. If the Bressan evidence contains any element of bias against defendant Binns that might be termed newly discovered, it has neither been described nor has any explanation been given why it was not available at the trial. It is not to be ignored, either, that the defendants did argue to the jury that Williams testified "in order to air his vengeance against thesetwo police officers" (Final argument 9); that Williams was "the witness that wants you to accept his testimony to convict thesetwo men against whom he has a grudge" (Final argument 12). (Emphasis added.) Although there was no evidence to support those statements, they gave defendant Binns a fair opportunity to persuade the jury that Williams should not be believed at all.
There is another area of the defendants' argument involving the Williams-Raymond relationship requiring the Court's attention. It is unfortunate that the Court must give consideration to an additional non-issue as much because it is time consuming as it is that their argument relies on another misrepresentation of the evidence adduced at the trial.
On page 15 of their final memorandum, the defendants say this:
 "Interviews with Mark Raymond (a cousin of Richard Raymond) and his parents, Alberic (a former deputy sheriff) and Alice Raymond, confirmed that Richard Raymond had met with key prosecution witness James Williams on several occasions in front of the home of Alberic Raymond prior to trial. (See Affidavit of Gilles Robert, previously submitted.)[11]"
Footnote 11 reads as follows:
 "This information is consistent with statements of Gina Raymond and contradicts the previous testimony of Richard Raymond and James Williams, both of whom had testified that they had discussed the case on only one occasion at Raymond's workplace."
The identical assertions may be found on page 11 of defendants' initial memorandum.
At no time when Williams testified did he say that he met Raymond "on only one occasion at Raymond's workplace." There was no testimony at all given by Williams about any meeting with Raymond. And the reference to a "meeting" between the two came to the jury in the following fashion. Raymond was asked in cross-examination:
 "Mr. Raymond, [at anytime] after the release was signed and this case was — appeared to be at rest, did you have any conversation with Mr. Williams at all?" [Tr. V.2, 462]
After a side bar conference out of the jury's hearing [Tr. V.2, 462-468] the state's objection to the question was sustained. During the side bar conference, defense counsel told the Court that Raymond had testified before a grand jury that Williams had visited him at his place of employment and, among other things, asked him if he was going to appear before the grand jury to testify. [Id. 463] The prosecutor then stated that the grand jury investigation was in February, 1986 and that, Raymond having been subpoenaed to appear, Williams was sent to Raymond "to check and see if he were served by the subpoena." [Id. 464] The Court assumes now as it did then that this is the grand jury investigation which resulted in the return of the indictment against these defendants on February 28, 1986. It was not until re-cross-examination that the trial jury heard about Williams "meeting" with Raymond. Defense counsel, reading from the grand jury transcript certain questions which had been asked of Raymond by a grand juror, put the following to Raymond:
 "Q. Question by the Grand Juror: `Can we go back to what you said before? You said that Jim Williams came to your job last night.' `Yes he did.' `Grand juror: And asked you if you would be willing to testify.' `Yes.' Remember that?
 "A. I remember that, yes." [Id. 481]
This is the entirety of the evidence that the trial jury heard of any "meeting" between Williams and Raymond. Notwithstanding the restricted scope of this testimony, the defendants took advantage of it by expanding upon it in telling the jury that Raymond testified at the trial that Williams went to Raymond's place of employment — which was certainly not so. [Closing Argument, Tr. V.6, 11]
Not only is it untrue that Williams and Raymond "had testified that they had discussed the case on only one occasion at Raymond's workplace," it is not even true, as the defendants have asserted, that interviews confirmed that they had met "on several occasions in front of the home of Alberic Raymond prior to trial." In support of that statement, defendants cite Mr. Robert's affidavit. On May 12, 1988, Mr. Robert stated under oath that he had interviewed Alberic and Alice Raymond two days previously. This is what Mr. Robert reported:
 "According to Mr. and Mrs. [Alberic and Alice] Raymond, Williams did visit their home at approximately 11:00 p.m. one evening and requested to speak with Richard Raymond. Richard Raymond and Williams did have an extended conversation in Williams' auto. Upon his return to the house from Williams' car, Richard Raymond told Mr. and Mrs. Raymond that Williams requested him to testify in a grand jury proceeding, where Williams would admit having beaten Richard Raymond during an arrest by the Glocester police. Richard Raymond further advised Mr. and Mrs. Raymond that because of his and Williams' testimony, he would be successful in obtaining money damages from the Town of Glocester . . ."
Here the defendants have not only misstated facts adduced in evidence at the trial but they misstate facts given to them by their own investigator. Even if it were material, the defendants have produced no other evidence to the Court that Williams and Raymond met "on several occasions in front of the home of Alberic Raymond prior to trial."
Further treatment by the Court of the Williams-Raymond connection is deferred to a later issue raised by the defendants in their motions.
The defendants make the argument that the Bressan evidence "[c]ontradicts the factual core of the State's case, namely that Richard Raymond had not committed the burglary of the Ronci home[.]" [Initial memorandum 9; final memorandum 11] They further "submit that the sworn statements of Gina Raymond and Richard Bressan are dispositive of essential elements of the State's case against them." [Initial memorandum 11; final memorandum 15] To be sure, the defendants should be the first to acknowledge that they went to trial on seven separate charges laid in the indictment. There were, consequently, a variety of "factual cores" to the state's case and not a solitary one. But none of the charges had as its factual core "that Richard Raymond had not committed the burglary of the Ronci home." Moreover, Count 6 of the indictment, which charged defendant Tooher with larceny, had nothing to do with the Ronci incident. It is true that the remaining accusations evolved from the Ronci incident but the state was not thereby put to the burden of proving that Raymond was not the felon.
Whether Raymond committed this burglary alone or not at all or whether he was involved in its commission with one or both of the juveniles to whom he said he loaned his car is totally irrelevant to any factual issue in this case. One of the factual questions certainly had to do with: who put the Ronci property in the Raymond vehicle? The Bressan evidence does not answer that question by saying Raymond admitted he broke into the Ronci home. He may very well have been the culprit but it does not necessarily follow from that that he took anything away with him.
The Bressan evidence is that Raymond was surprised while committing the crime. Mr. Ronci's son, who arrived at his father's house shortly after the break-in and while the police were still in the house, testified that he could not say if any of his father's property had been taken by the burglar. And defendant Tooher testified that a four foot television screen had been unplugged and taken from one section of the house to the front door. [Exhibit 25, 29] Williams made a similar reference when he said that he observed a large television screen moved from the wall. [Tr. V.1, 96] The Court ventures to say that if Richard Raymond broke into the Ronci home and was scared off before he could take anything out, he would not be the first burglar to leave empty-handed.
The Bressan evidence does not end with Richard Raymond's admission that he broke into the Ronci home. It continues with Raymond's further admission that he took Ronci's property and placed it in his automobile where it was eventually found by defendant Binns and officer Hainsworth. There is nothing new about this evidence that it may have been Richard Raymond who was the guilty party. Had the Bressan evidence been presented by the defense to the trial jury it would have simply further impeached Knight and Raymond and would have added to the evidence which the trial jury already had from which it could have decided that Raymond had broken into the Ronci house and stolen the items found in his car. It is, therefore, "merely impeaching" and "cumulative." The Court shall point specifically to that evidence which has already been placed before the trial jury.
While it ought not to need restatement, it is beneficial to recall on occasion that whether the evidentiary structure in a given case is narrow or broad, it is the jury which has the initial prerogative to accept and use what it believes to be true and to discard that which it discredits. That function in this case resulted in the conviction of these defendants but their verdicts were not a pronouncement that they had no evidence which would have permitted it to acquit.
Much of the evidence in this case was subject to jury evaluation but some evidence was of undisputed character so that a jury bent on a proper discharge of its duties must necessarily have accepted it. There can be no doubt that the Ronci home had been broken into, that Richard Raymond's car was seen leaving the Ronci home at the time of the break and that Ronci's property was found in that vehicle. It was also established as an independent fact and received as substantive evidence that when this incident occurred Raymond was on a suspended sentence and probation. [Tr. V.2, 422-423] Although they differed on who proposed the terms of the release, both the defendant Tooher and Raymond testified that with Raymond's signature on the release the defendant Tooher would not charge Raymond with the Ronci burglary thereby eliminating the risk of Raymond going to jail as a probationary violator. [See Id. 423, and Tr. V.4, 857; Exhibit 25, 20 and 24] Raymond told the jury he was well aware of the violation procedure and was concerned that he might be sent to prison. [Tr. V.2, 457-458] His credibility had been impeached by the disclosure of his prior convictions and the testimony he gave to the grand jury under oath which contradicted his trial testimony. Exhibit 18 contains the statement: "At approximately 11:15 p.m. Sgt. Knight observed FN32 pull into the yard and a short white male get out and go into the trailer." Although Williams testified that this was not a true statement, considering the fact that Knight did not disavow it at any time, the jury could accept the statement as true and disbelieve Williams. The jury could see that Raymond was a short, white male he having testified, in addition, that his height was 5'2". Defendant Tooher testified from the witness stand and by way of exhibit 25 that when Raymond was in custody defendant Tooher asked him what happened. Raymond's response was such that the jury could interpret it as an admission of guilt. [Tr. V.4, 844, 962; Exhibit 25, 12 and 13]
This amalgam of undisputed and disputed facts would have warranted the trial jury to conclude that, despite Raymond's testimony that he had been home all of the evening of June 30, 1984, he had in fact been involved in the Ronci burglary. It is open to argument whether on that state of the evidence the jury could properly have gone further and decided that he had taken items out of the Ronci home. This evidence was more than sufficient, nevertheless, to create a reasonable doubt of the defendants' guilt even if the defendants themselves had not testified. But together with their testimony, had the jury opted to accept it, the ineluctable conclusion was precisely what the Bressan evidence seeks to show — that it was Raymond who put the Ronci goods in his car and not the defendants. The jury was told, by the defendant Tooher in the presence of the jury and through exhibit 25, and by defendant Binns through exhibit 25, that they took nothing out of the Ronci house. Defendant Tooher went further and specifically contradicted Knight's testimony that Knight was present with the defendants when the defendants went to the Ronci home. Defendant Tooher made it clear that he did not see Knight at all that evening [Id. 851-852]. If all of this testimony had been believed by the jury, its net effect would have been the same had the Bressan evidence been adduced by the defendants at the trial. That effect would certainly have entailed the impeachment of Raymond and of Knight. It must be said, too, that the defendants used this conglomerate of evidence at the trial to their advantage. Faced with the testimony of Knight, Williams, and Mrs. Raymond that there was nothing in the Raymond vehicle before it was put behind the Chepachet barracks, counsel for the defendants argued to the jury that it should consider that the items were not visible to the three witnesses because the items were "under the seat." He exhorted the jury to use its common sense and conclude that the items were visible at the time of the inventory by Hainsworth and the defendant Binns because the car had been lifted by the tow truck and with the car on the hook: "Doesn't it make common sense to you, that items underneath that seat would now roll on the floor, slide back onto the back seat — back portion of that car?" [Closing Argument, Tr. V.6, 21-23] Such is plainly an argument, based certainly on the evidence, giving a reasonable explanation that the goods were placed in Raymond's car, not by the defendants, but by whoever drove that car from the Ronci intrusion. There is no cause to have it repeated at another trial.
In spite of this evidentiary state, the defendants seem to place special significance on the fact that at a new trial Richard Bressan and Gina Raymond are prepared to testify that it was Richard Raymond himself who told them that he had put goods which he had stolen from the Ronci home into his car. Assuming, however, that Richard Raymond testified again for the state precisely as he has already, the Bressan evidence simply adds to the impeaching evidence which came before the trial jury. Although the Bressan evidence adds the element of an admission by Raymond, the quality of the Bressan evidence is not the same as if Richard Raymond were ready to recant his previous testimony. Even a newly discovered recantation of testimony by a witness who testified at a former trial does not insure the probability of a subsequent acquittal. See e.g., State v. Brown,528 A.2d 1098 (R.I. 1987) and State v. Estrada, 537 A.2d 983 (R.I. 1988).
The Court finds that the Bressan evidence is not of the kind that would probably change the verdict at a new trial. The defendants must necessarily have known at the trial that the jury had evidence from which it could have found that Raymond was the one who put the items in his own automobile. The Court must conclude that their approach to the jury on the evidence adduced was to concentrate on the credibility of the actors involved. The strategy they selected can hardly be criticized. Their strategy was revealed in the earliest stage of the final argument when the jury was told:
 "And I might at the outset of this case preface all my remarks to you in the context of three witnesses, Williams, Robert Knight and Richard Raymond. And I submit to you without fear of any contradiction, based upon the evidence in this case, that Williams, Knight and Raymond, engaged in a course of conduct that led to a conspiracy of lies in this courtroom. They lied to you and I'll show that to you in my argument."
 [Tr. V.6, 3]
And the defendants indeed did not spare these three witnesses from a persistent attack on their veracity and were certain, too, to remind the jury that Williams and Knight had a "grudge" and were seeking "vengeance" on both of the defendants. And the argument ended on the same note as it began:
 "The presumption of innocence is the witness that cannot be impeached. The presumption of innocence is the cloak, the shield that protects all of us against being convicted based upon suspicion, based upon perjured testimony, based upon the likes of Jimmy Williams and Bobby Knight."
 [Tr. V.6, 27]
To conclude that this approach was eminently sound, all that needs to be done is to look at who the five people were who were the subject of this summation. Williams and Knight were both impeached witnesses whose careers as Glocester police officers were adversely affected — though the jury could well have settled upon the term "ended" — by actions taken by defendant Tooher. Raymond was an impeached witness and a convicted felon. Defendant Tooher had a twenty year unblemished record as a Providence police detective and Glocester police chief. Defendant Binns had been Glocester police chief after having gone through the ranks. [Exhibit 25, 38] With this presentation, with this pitting of three impeached and self-motivated individuals against two unsullied police officer-defendants, an acquittal on all counts would have been unremarkable. But it is of moment to recall that defendant Tooher was both convicted and acquitted. This is indicative of the strength of the prosecution evidence on the counts on which the defendants were convicted. It is highly improbable that, at a new trial, the Bressan evidence would so attenuate that strength that a different verdict would result.
Perhaps sensing this impediment to the success of their motions, the defendants make this argument.
 "A review of Rhode Island, federal and other state law suggests that the principal threshold determination for the trial court considering newly discovered evidence is whether the evidence `would probably change the verdict at a new trial.' (cite omitted) `Merely impeaching' or `cumulative' are statements of the negative; to warrant a new trial, newly discovered evidence must be evidence which would more likely than not change the outcome. See United States v. Agurs." (cite omitted)
 [Initial memorandum 6, final memorandum 8]
 * * *
 "Thus, in assessing newly discovered evidence in Rule 33 motions for new trial, the federal courts have applied the probability standard set forth in Agurs: `If there is no reasonable doubt about guilt whether or not the new evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. Agurs, 427 U.S. at 112-113."
 [Initial memorandum 7, final memorandum 9]
The case referred to, United States v. Agurs, 427 U.S. 97, does not stand for the proposition advanced by the defendants. The language cited above from Agurs is extracted from the court's opinion without any relationship to its context. It is not the court's holding. The case does not involve a rule 33 motion.
At the very inception of its opinion the court stated that: "[t]he question before us is whether the prosecutor's failure to provide defense counsel with certain background information . . . deprived [defendant] of a fair trial under the rule of Brady v.Maryland, 373 U.S. 83." [at 98] The court went on to consider "whether the prosecutor has any constitutional duty to volunteer exculpatory matter to the defense, and if so, what standard of materiality gives rise to that duty." [at 107] It was with this background that the court, setting out the rationale of its holding, employed the language quoted by the defendants. That language, in proper context, reads:
 "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence, [meaning the evidence which a prosecutor fails to volunteer] creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."
 [Agurs, 112-113, footnotes omitted]
Far from the Agurs holding being applied to a rule 33 motion, the Supreme Court made it plain that a different and more burdensome standard applied in a rule 33 motion.
 "[T]he fact that such [non-disclosed] evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal." Id. at 111 (Footnote omitted.)
Besides, the jury selection of one set of facts over any other set of facts does not render its verdicts "of questionable validity." If it were otherwise, then every case in which a verdict is based in large part or entirely on the credibility of witnesses would be subject to re-trial on the slimmest of impeaching evidence subsequently discovered.
The Court's conclusion that the Bressan evidence is merely cumulative and impeaching by itself renders it unnecessary for the Court to set out its independent assessment of the credibility of Gina Raymond and Richard Bressan. Be that as it may, in this case, the defendants ought to be made aware of the Court's judgment in that regard.
The question whether Richard Raymond told his niece, Gina, and her boyfriend, Richard Bressan, anything at all about his Glocester experience is easily resolved. After all, he was related to Gina and one might say that Richard, as the father of Gina's child, was, de facto if not de jure, his nephew. The uncle and nephew shared other bonds — they are both criminals and they are both drug addicts. Raymond himself has said, in a letter to the Court, "I'm no angel." It should not be surprising, then, if he has boasted of an expectation of financial gain abetted by a vengeful rookie cop and has taken cruel glee at the tragic plight of two former police officials. The important point is whether Bressan and Gina have told the truth so that the Court can say that the statements of Richard Raymond upon which the defendants are relying to their advantage were in fact made by Richard Raymond.
Essentially, what it comes down to is whether Bressan and Gina are repeating with substantial accuracy what Raymond has told them, or whether they, in good faith, are placing their own interpretation upon what they believe they heard, or whether, for motives discernible or not, the Bressan evidence is made out of whole cloth. Some of that evidence is palpably not in accord with the trial testimony. Richard Raymond most certainly was not interrupted by the police during the Ronci burglary. Nor did he steal something "big, bulky, [and] awkward" and put it in his car trunk. Since, according to the trial testimony, those events never occurred, did Richard Raymond lie to them or is the Bressan evidence not credible?
It has already been noted by the Court that the disclosures which Bressan and Gina Raymond made to the Woonsocket Police about their conversations with Richard Raymond followed the robbery of the Dairy Mart store by Richard Raymond on April 13, 1988. From the evidence presented by the defendants in support of their motions, it appears that the very first of the revelations occurred on April 18, 1988, five days after the robbery. That was not Bressan's first opportunity to tell the Woonsocket police — or any other police authorities — about Richard Raymond's statements to him. Since it will be necessary for the Court to refer to matters expressed at different periods of time by Bressan, it will be helpful to list the dates of the documents pertaining to him to which the Court will be making reference.
The evidence given by Bressan, most but not all of which the defendants have made available to the Court on these motions is: two statements given by him to the Woonsocket police: one on April 18 and the other on April 21, 1988; an examination under oath by counsel for the defendants and by her investigator on April 28, 1988; his testimony before a grand jury on October 27, 1988; his testimony before the Court on January 10, 1989. The date of his grand jury appearance has been gleaned from testimony given before that body to the effect that immediately prior to his appearance before it that day he had waived indictment in the Dairy Mart robbery and had been sentenced. The papers in the case in State v. Richard Bressan, Pl/88-4621 reveal that indictment was waived and sentence imposed on October 27, 1988. References to the statements he made to the police and to the transcripts of his sworn testimony shall be by the respective dates.
On April 21, 1988 the Woonsocket police asked Bressan this question:
 "Richard, can you tell me in your own words what Richard Raymond told you about his suing the Glocester, R.I. Police Dept?"
 "A. Bo [Richard Raymond] told me that he was doing a BE in Glocester. Bo told me that he was interrupted while doing the BE by the police. Bo told me that the police beat him up. Bo told me he put the stuff in the car and that the cops did not put the stuff in the car . . ."
Considering the manner in which the question was framed and the fact that previous questions and answers had to do with Raymond's lawsuit against Glocester policemen, that last answer was totally gratuitous. In any event, it is fair to infer from that answer that Raymond said that it was he who had stolen Ronci's property and put it in his car and that the defendants are blameless. So far as the Court has been made aware, that response by Bressan represents the very first time he made that disclosure to anyone. His identification of the time when he and Raymond had the conversation is confusing. Bressan says at first, "About three weeks ago Bo began to talk about getting $50,000. . . ." Later on, when asked, "Richard, when did this conversation between you and Richard Raymond take place?" he said, "[a]bout April 15 or 16, 1988." It is unclear whether the latter date applies only to Raymond's discussion of his crime or whether it includes the "talk about getting $50,000." But whether it was "about" two weeks before the Dairy Mart robbery of April 13th or "about" two days after that robbery, it is evident that Bressan had important information and the opportunity to impart it well before he came into the police station on April 21.
When Bressan was testifying before the court on January 10, 1989, he was asked the circumstances surrounding his appearance at the Woonsocket police station on April 18, 1988. He said:
 "Well, me and Gina had gotten in an argument and she called the police. She wanted me out of the house. So the police, when the police arrived, she told me to tell them about Dairy Mart while they were there, so that's how it started and I told them about Dairy Mart." [1/10/89, 85]
His testimony before the grand jury establishes that that event occurred around 3:30 in the morning on April 17 and that his statement dated April 18 was in fact his second appearance at the police station in as many days. Before the grand jury, the prosecutor questioned Bressan:
 "Q. Did there come a time some few days later [after the April 13th Dairy Mart robbery] when the police were at your house for something else? Police came?
 "A. Yes.
 "Q. And did Gina say something in your presence to the police about tell them about the Dairy Mart?
 "A. Yes.
 "Q. On April 17th, 1988, did you go to the Woonsocket Police Station and give them a statement about what had happened at the Dairy Mart?
 "A. Yes I did.
 "Q. And was that statement made into typewritten form?
 "A. Yea.
 "Q. And was it two pages long?
 "A. Yep.
 "Q. Is this a copy of the statement you gave to the police on April 17, 1988?
 "A. Yep.
 "Q. Is this your signature on the first page?
 "A. Yep.
 "Q. Is this your signature on the second page?
 "A. Yes it is."
 [10/27/88, 19-20]
The prosecutor then read to Bressan from what the prosecutor described as "this first statement." [20] The prosecutor continued:
 "Q. Now do you remember that the next day, April 18th, you went back to the Wooonsocket police and made another statement, do you remember doing that?
 "A. Yes.
 "Q. And was that statement reduced to typewritten form?
 "A. Yes it was.
 "Q. And in that statement, is this the copy of that statement? You see the date here?
 "A. Um humm.
 "Q. Is this a copy of the statement you gave the Woonsocket Police on April 18th?
 "A. Yea.
 "Q. And its three pages long right?
 "A. Yea.
 "Q. And is this your signature or a copy of it at the bottom of each of those pages?
 "A. Yep."
Again the prosecutor read aloud from the statement. Need it be said that the three page statement of April 18th, a document not provided to the court, is an entirely separate one from the single page statement of the same date which defendants did provide to the Court? It is to be presumed that had the absent statements of April 17 and April 18 contained anything which could conceivably be regarded as helpful to the defendants, they would be part of the evidence on these motions.
According to Bressan's own testimony, he had in his possession information about Richard Raymond which he had received as recently as the day before April 17 or for as long as "about three weeks" before April 17. Yet when he was in the police station on April 17 he did not disclose any of it.
During his next session on April 18, there was similar silence about Raymond's implication in the Ronci burglary. On this occasion, he said to the police that, "Richard Raymond had told me that a rookie cop had come to see him and that he wanted to get even with two cops that had him fired. Raymond told me that they got together and he was going to fight the case with Raymond and he would get his job back or revenge." That conversation epitomizes Williams' desire for revenge rather than criminal activity on the part of Raymond. Bressan's statement that day is conspicuously brief, ending in this fashion:
 "Q. Has he [Raymond] told you anything else about the above?
 "A. Just that he can't wait to get his money."
This last question was a wide-open one and gave Bressan the occasion to tell the police everything that Raymond had told him. Instead, Bressan's answer implied that the conversation had to do only with money.
Even on April 21st, the questions and answers were directed to Raymond's monetary expectation until Bressan interjected irrelevantly that Raymond and not the defendants had put Ronci's articles in the car. The irrelevancy of that answer, when viewed with the complete statement in the background, manifests a pre-conceived plan contrived by Bressan and his girlfriend in the three days after his April 18th statement. She, too, was at the police station on April 21, giving her first statement, parroting what her boyfriend had just finished saying. There is other evidence in this case, to which the Court will give its attention, compelling the conclusion that these two individuals are not to be believed. But this course of events from the April 13th robbery to the first accusation on April 21st of Raymond's wrongdoing is sufficient, standing alone, for the Court to find, at the very least, that what they say about Richard Raymond is unreliable and, in the Court's judgment, a total fabrication.
This situation strikes the Court as one in which Bressan and Gina embroidered upon the fact that Raymond had a civil rights suit pending against the town of Glocester and these defendants. If Raymond had been crowing about the predicament in which he had placed the defendants with his law suit, it would not take much imagination for Bressan and Gina to expand upon what the uncle had actually said.
They had their purposes. He had entered the Dairy Mart with Raymond when the store was robbed and he told her so after he returned to her apartment. In her statements, she has rationalized his presence there by saying that Bressan did not know that Raymond was going to commit a robbery. Nevertheless, whether they were correct or not, he believed that there were surveillance cameras in the store [4/28/88, 9] and so did she. [Her sworn statement 4/28/88, 29] She went so far as to say: "Because by them looking at the surveillance camera, I assumed they would realize Ricky and Bo had gone into the store together." [1/10/88, 45-46; her sworn statement 4/28/88, 42] Within days of his arrest on May 6, 1988 for the Dairy Mart robbery, he gave a videotape deposition in which he said: "I know that store like the back of my hand. I know what's in that store. There's cameras in that store. It's even displayed. It tells you right on the door. There's cameras in that store." Laboring under that apprehension, they decided to provide the police with material which might ameliorate his lot with the prosecuting authorities. They certainly were not acting as public spirited citizens — people who wished to see an injustice righted. If they were concerned with an injustice, why did they delay? It is guileless to believe that a man who has been imprisoned in Pennsylvania for breaking and entering, has taken possession of goods which he knows to have been stolen, has participated in an armed robbery and is a confessed drug addict was wrestling with his conscience either for five or six days or for three weeks before he decided he had a duty to tell the police about Raymond's conversation. Her motive, it should be obvious, was to keep the father of her child, whom she described as her lover [Her deposition 6/22/88, 15] and with whom she was in love [Id.
50] and desired to marry, [Id. 5/19/88, 31] out of jail.
If anything can be asserted beyond doubt in the resolution of these motions, it is that Richard Bressan is a perjurer. It is mystifying to the Court that the grand jury before which he admitted committing perjury did not return an indictment against him for the commission of that crime. He admitted to the grand jury that he was lying when he told the police on April 17 that he did not go into the Dairy Mart store with Raymond. He admitted to the grand jury that he lied again to the police on April 18 when he said that he went into the store but did not know that Raymond was going to pull out a knife and rob the clerk. Six months before making these admissions under oath, he gave contrary testimony under oath. In his sworn statement of April 28, 1988, he told defendants' counsel and her investigator that he "was amazed" when Raymond pulled out the knife, that he "didn't know what to do" so he ran. [7] In the course of the same examination, he described having told the police, "I told them right out, Bo did it, I went in the store with him, I didn't know at the time what he was doing, so I don't want to get involved." [10] And in the presence of the grand jury, having received a twelve year suspended sentence for the Dairy Mart robbery, his response to the question, "You knew there was gonna be a robbery?" was, "Yes." [10/27/88, 26] Under all of these circumstances, one would be forced to conclude that perjury had been committed even if he had refused to admit it. But his admission forecloses any question about it. [1/10/89, 66] And his motive for his lies was that he "didn't want to get in trouble." [10/27/88, 22]
It cannot be gainsaid that Bressan's information of April 21st followed a previous statement in which he said that Raymond's conversation concerned Raymond's lawsuit and made no reference at all to the Ronci burglary. When he completed his April 21st statement, he did so by saying that he had told the police "All I know" and that the statement was the truth. How honest and truthful he was with the Woonsocket police on April 21 can be demonstrated by the following exchange:
 "Q. Mr. Bressan, when you admit (sic) before that you lied under oath in a sworn statement to Miss Schiff, do you know that's perjury?
 "A. No.
 "Q. You don't know that, do you? Do you know what perjury is?
 "A. I know what perjury is, but I just didn't, you know.
 "Q. You thought that was one of those cases it was okay to lie?
 "A. Wasn't intentionally to lie. It was more or less. I was just trying to cover up my dirt.
 "Q. And if you lied under oath in regard to what you told the Woonsocket Police Department that Richard Raymond said, that would be dirt you'd want to cover up too, wouldn't you?
 "A. Yes it would."
 [1/10/89, 77-78]
The dirt he was trying to cover up at Richard Raymond's expense was his own participation in the Dairy Mart robbery. And since Gina Raymond was his cohort in that endeavor, it should be sufficient on that basis to dismiss summarily her unsworn and sworn assertions about her uncle. But in the Court's view, to do so would be to trivialize the breadth of their deceit in an effort, not to see that justice is done for these defendants, but to keep Bressan from going back to prison again.
Just as her boyfriend had done immediately before her, she told the Woonsocket police on April 21, for the first time, that her uncle had committed the Ronci burglary and had placed the stolen items in his car. She said then, as she did the following week in her sworn statement to defendants' counsel and the investigator, that the conversation in which Raymond related this to her had occurred "months ago." [4/28/88, 3] Consequently, this witness was carrying with her for months information which, if true, was vitally important to the defendants. And neither she nor her boyfriend were motivated to reveal it until they did so simultaneously when her boyfriend's freedom was put at risk. This is the same witness who testified before the court that her uncle "doesn't trust me to keep his secrets." [1/10/89, 32] This is the same witness who, on April 21, told the police that her uncle was responsible for putting the Ronci goods in his car, who told the Court that she was "outraged" at what her uncle had done, [1/10/88, 26] but whose sense of values is evidently so shabby that she did not also tell the police "of a murder [Richard Raymond] committed years ago, that he had shot a man in a liquor store hold up." [1/10/89, 32]
She has testified that albeit the fact that her uncle did not "trust [her] to keep his secrets" he confided in her with what one would assume would be the secret that he is guilty of the conduct for which the defendants have been convicted. And this confidence was given in a single conversation with her. [Depositions of 5/19/88 at 9 and 6/22/88 at 28] The prolixity with which she has reproduced this single conversation during the ensuing months has, inevitably because of its falsity, resulted in contradictions.
On April 28, 1988, Gina Raymond stated the following under oath:
 "Q. Did he [Richard Raymond] tell you when he did the [Ronci] BE?
 "A. At night time, I don't know when. He didn't mention any days or dates or nothing. I knew it was at night because he mentioned something about his car. It was the night time, he was doing a BE and he got busted in the middle of it, and then he turned around and said the cop stashed something in his car but he said he did the job.
 "Q. Let me stop you for a moment. When your uncle was talking about the BE, did he say where, and I mean in which town it occurred?
 "A. No, Glocester.
 "Q. So he didn't tell you —
 "A. Glocester, he said.
 "Q. Oh, he did tell you?
 "A. He said he was in Glocester, but I don't know anything about Glocester, so I don't know what towns are in it.
 "Q. He specifically said to you that he did a BE in Glocester?
 "A. Glocester, he was in Glocester."
 [4/28/88, 8-9]
Lest there be any doubt about that testimony, she said this at her deposition on June 22, 1988:
 "Q. Is that the basis upon which you said it was at Glocester?
 "A. That's the basis that I found that it was this particular B and E that he had done and not one he — other one he was talking about was because this was the only one he got caught at and he specifically told me he got caught doing this B and E in Glocester and this case." (Emphasis added.)
 [6/22/88, 47]
On January 10, 1988, Gina Raymond stated the following to the Court under oath:
 "Q. Okay. Did your uncle tell you when this burglary or this BE had occurred?
 "A. No, he didn't.
 "Q. Okay. Did he tell you where it had occurred?
 "A. No, he didn't."
 [1/10/89, 3]
On April 28, 1988, Gina Raymond stated under oath as follows:
 "Q. During the course of conversation, your uncle, Richard Raymond, specifically stated to you that he had done the BE?
 "A. Done the BE.
 "Q. Your uncle also specifically stated, am I correct, that he, meaning your uncle, had stashed whatever items he had taken?
 "A. Had put it in his car. He got caught right in the middle of doing it. When you're doing a BE and you're out of the house and putting the merchandise in your car, you're caught right there, that's considered the middle to me, you ain't away from the scene, you didn't get away with it, you're caught.
 "Q. Did your uncle specifically say to you that he had been caught at the scene of the burglary?
 "A. No, at the car.
 "Q. At the car?
 "A. Because he had a hard time carrying out the stuff. That's what stuck in my head. The thing was big and there was other stuff, I guess, but it was to do with the car, there was no mention of the house afterwards except to take the stuff out."
 [4/28/88, 16-17]
She said the same thing in her deposition on June 22, 1988:
 "A. He told me specifically about one burglary he got caught for.
 "Q. And what —
 "A. In Glocester.
 "Q. And what did he say about that please?
 "A. He said he did a breaking and entering at nighttime, took the merchandise, put it in his car, and he got caught by the Glocester police."
 [6/22/88, 27]
But as it turned out later on in the same deposition, what she was stating as fact under oath was merely an assumption:
 "Q. Do you remember being asked, in essence, a question concerning the breaking and entering in Glocester as to where Richard Raymond was apprehended by the Glocester Police?
 "A. Yes, I said I thought it was at his car. He said got — he got busted in the middle of it, so I assumed, not factually, assumed it was at his car that the police apprehended him.
 "Q. But do you recall Richard Raymond telling you that when he got busted, that is by the Glocester Police Department concerning the breaking and entering that he was arrested in the middle of the breaking and entering?
 "A. Which I figured was — this is my — this is my opinion, it — I am just assuming, I am not — I am talking the conversation, running it through my brain and coming out with figures and facts like two plus two makes four, okay. He said he was caught in the middle, red-handed. I figured he was caught right there and then and that I do not know the facts. I was not there, sir.
 "Q. What did Richard Raymond tell you about how he was apprehended by the Glocester Police concerning this particular —
 "A. Nothing.
 "Q. — incident, to the best of your knowledge?
 "A. As far as I know, that after — after they got him, he had never seen said (sic) nothing at all.
 "Q. Did they tell you where they got him?
 "A. I assumed, no, he didn't.
 "Q. My question is —
 "A. I assumed it was at has (sic) car. No, he did not tell me exactly where they apprehended him. I assumed it was at the car where he was doing the B and E from the way he was speaking, I assumed.
 "Q. But you don't remember what he said specifically as to where he was apprehended?
 "A. He did not name a place or a date."
 [6/22/88, 55-57]
On April 28, 1988, Gina Raymond gave these answers under oath:
 "Q. Did your uncle mention during this conversation that there was any other Police Officer who was fired or suspended or kicked off of the Glocester Police Department?
 "A. Two. There's two people I know of that was kicked off, I think, but he only talked about one.
 "Q. He only talked about one?
 "A. But I think there was two."
 [4/28/88, 19]
The Court takes those answers to mean that her uncle told her that two police officers were discharged but that his conversation with her involved only one of them. Yet on May 19, 1988 she said this under oath:
 "Q. During the course of the conversation with your uncle, did he mention anything about a police officer?
 "A. He mentioned one police officer but not by name.
 "Q. Can you tell me what he mentioned, what he said about this particular police officer?
 "A. He said that a police officer was fired from the Glocester police station for something, I don't know what [.] . . ."
 [5/19/88, 11-12]
It is plain that on one occasion she states that in her uncle's single conversation with her he said that two officers had been fired and that on another occasion she states that her uncle said only one officer was fired.
In the course of her statement on April 28th, Gina Raymond discussed her view about drug addicts and the use of drugs by her uncle. She inveighed against drug abusers in saying, at 5: "I do not like drugs. I do not like my uncle because he does drugs, he is not my type of people. I am more towards my mother's family, who has no history of drugs at all, but my father is my Uncle Bo's brother and they are into drugs, that side of the family." If Gina Raymond is more like her mother's family, one must wonder whether that fact speaks well of her because at page 32 of the very same sworn statement she states: "My whole family has a bad drug history, my parents and everything, so I am very against it." She elaborates on this theme at page 45:
 ". . . you don't know the true side, my father died doing drugs, my mother used to be a junky, an x-heroin addict. Uncle Bo was an addict at 14, my boyfriend is a friggin junky, I am living on Borden Boulevard on Welfare because he's not man enough to get a job because he's so hooked on drugs."
This is a person who stated under oath that she "detests drug addicts," [4/28/88, 32] that she dislikes Richard Raymond "because he does drugs" and had no respect for him because he did not have a job [Id. 33] yet is in love with Richard Bressan [6/22/88, 50] who, she acknowledges, is "not man enough to get a job" and is a "cocaine addict." [4/28/88, 40] And when she says this about her uncle Richard Raymond, "I mean I can't say I care about him, I don't like him, but I love him" [Id. 38] she makes no sense at all.
During the statement she gave under oath on April 28, 1988, in what appears to the Court to be totally foreign to the matter at hand, she referred to her uncle as an insane person of whom she had no fear in this way: "He doesn't trust me, he doesn't like me, because I guess I'm not his type of person, okay, I don't take no [deleted] from him, and I just tell him right out, [deleted] you, Bo, and I'm not ascared (sic) of him as to the fact that if he came over, I'd probably knock his [deleted] down instead of him doing me bodily harm. Q. But yet he does come to you? A. He's a crazy man." [4/28/88, 20] On May 5, 1988, exactly one week after this assertion of fearlessness, she appeared at Richard Raymond's bail hearing in response to a subpoena. [5/19/88, 25-26] In the course of the bail proceeding, the following is reported to have occurred:
 "Q. At that time, also, did you express to the Court a fear of your uncle?
 "A. Yes. I specifically asked that — well, not asked, but I qualified my position where I didn't want my uncle to have any contact with me because I thought he was crazy enough to do bodily harm to someone, especially me.
 "Q. So that you asked the Court —
 "A. For protection." [Id. 28]
She was more succinct before this Court:
 "Q. Can you tell the Court what you said during the course of the bail hearing?
 "A. I asked the judge that he not permit my uncle to be released on low bail, because of my fear of him doing me bodily harm." [1/10/89, 16]
Although Gina Raymond has not, as Richard Bressan has, admitted that she has committed perjury, the record before the court admits of no other conclusion. The Court rejects their perjured testimony about Richard Raymond and recognizes it for what it is — as their attempt in concert to avoid further incarceration of Bressan.
 III. The newly discovered evidence from James Thomas Lancia.
On October 7, 1988, James Thomas Lancia was arrested in Warwick on a fugitive warrant issued by Florida authorities. He was committed to the Adult Correctional Institutions where he remained until being admitted to bail on November 29, 1988. While confined, he met Richard Raymond who was also imprisoned. On November 13, 1988, Lancia wrote the following letter.
 "November 13, 1988 "James T. Lancia "P.O. Box 8249 "Cranston, R.I.
 "To Whom It May Concern:
 "It has taken me since June 2, 1988, (sic) to decide in coming forward on this matter that I presently write about, due to the apparent jeopardy of my life, in so deciding.
 "Therefore, after much thought having been given to this safety and for security that I must insure, of my own person, it is necessary that strict compliance with regard to my suggestions, be minutely acted upon.
 "Regarding U.S. District Court Case Number, C.A. No. 87-0209L, Richard Raymond, plaintiff, vs. Richard Tooher, Bruce Binns, James Williams and John Driscoll, defendants, I personally have certain information of a vital nature to both C.A. No. 87-0209L and the criminal matter of the Ronci robbery, where Richard Raymond is charged.
 "This information is irrefuteable, (sic) and thus has had no past exposure. It is my belief that this evidence will fully support the defendants in the Civil Action and most assuredly will win a conviction in the criminal case, as mentioned.
 "It is with trust in the humane (sic) nature, that this communication, at this time, will be kept strictly confidential, and at this time, only spoken to one (1) attorney of your choosing, who, (if you so desire), will visit me here, as though he were interviewing me as a prospective client.
 "At such time, I will be as straightforward as I possibly can, in relating my respectful requests, in return for this information.
 "Additionally, I further believe that I will be amendable (sic) to testifying as to such new evidence, at both State and Federal trials.
 "It must be noted, that if any other person,
aside from the one attorney that you choose, attempts to contact me, or illicit (sic) further information from me regarding this letter, I will as a matter of self-protection, either refuse to speak, or cite some 5th Amendment privilege, (sic) or etc. To more assist a speedy response to this initiation, I tell you that I am here on a fugitive from justice warrant, being held in no bail status, and have been charged in such requisition as being a probation violator in the State of Florida.
 "I never have used any drugs of any kind no (sic) do I have any crime of violence on my record where I ever inflicted any physical harm upon any person. (However, I was convicted of armed robbery in the State of Florida, in 1982, however, such conviction in 1986, was set aside by the trial court, and the sentence was vacated.) I was presently on ten years probation at the time of my arrest on October 7, 1988. I was gainfully employed from my release in Florida, up to and including my arrest as a fugitive for bail violation, (failing to pay a $50.00 probation fee.) I have no attorney at present. My case is pending in Kent Co.
 "Respectfully submitted,
 "James T. Lancia
 "P.S. It is of extreme importance that the attorney sent not be known by Richard Raymond
 "November 13, 1988. Thank you. J. Lancia"
 (Underscoring in the original)
John Driscoll, one of the four defendants against whom Richard Raymond brought his civil rights action, has testified that in November, 1988, he was the treasurer for the town of Glocester. He said that he received the Lancia letter in an envelope addressed to "The Finance Director of the Town of Glocester." News of the existence of the letter shortly reached defendant Tooher. Defendant Tooher thereupon called counsel for defendant Binns and himself in this proceeding who obtained a copy of the letter. On December 4, 1988, counsel took Lancia's deposition to explore the extent of his knowledge of the content of the letter.
Lancia's deposition discloses that he has learned a great deal about some of the events that eventually resulted in the convictions of these defendants. The information that he was prepared to divulge to those whom it might have been of concern is, on the whole, a reiteration of the Bressan evidence but with greater emphasis on Raymond's civil claim. What he proposed to expose was obtained from Raymond who consulted him about all legal matters (Deposition, 5) but who spoke with Lancia in great detail about the civil suit. (Id. 6) In short, then, at another trial of these defendants, Lancia would tell the jury what Gina Raymond and Richard Bressan are also ready to testify about. Lancia's deposition renders it apparent that he is in a position to flesh out the Bressan evidence with more detail but what he has to say does not change the character of his evidence. It is still impeaching evidence and cumulative in nature.
For example, he is ready to say that Raymond told him that Raymond was not struck in the back but had actually fallen down the stairs. But the jury which convicted the defendants received that evidence. David Piccirillo testified he was watching Raymond being brought into the station by Williams and the defendant Binns. He said he saw neither of the officers strike Raymond. [Tr. V.3, 725] He saw Raymond fall down the stairs [Id. 672] and described the manner of the fall in detail. [Id. 709; exhibit 24] Defendant Binns told the jury that he and Raymond fell down the stairs. [Exhibit 25, 7]
The defendants argue that they are entitled to have Lancia tell another jury that Raymond admitted to him that he stole things out of the Ronci home and placed them in his car. But, as the Court has previously set out, the trial jury was given an abundance of evidence which would have permitted it to acquit the defendants on that basis. The Lancia evidence does nothing more than add a third witness to testify about Richard Raymond's statements. And as the Court has already said, the fact that they will say that it was Raymond himself who told them these things does not change the cumulative and impeaching nature of the statements nor make it probable that another jury would change the verdicts in this case. What the defendants appear to be doing is to be placing too great a value on the trial jury's assessment of the credibility of Richard Raymond and to be ignoring the jury's evaluation of the credibility of Knight, Williams, Piccirillo and the defendants Tooher and Binns.
The fact is that the trial evidence is in such a state that it could support these convictions even had Raymond never appeared as a witness. His appearance was not necessary. The testimony he gave relating to whether there were any items in his automobile and of the assault upon him by defendant Binns had already been presented to the jury by previous witnesses when he made his appearance. Suzanne Butler could have been called by the prosecution to testify about the execution of the general release. Of course, only the trial jury knows whether the breadth of the evidence having to do with the obtaining of the release was of any value but it is open to serious question whether Raymond's testimony was a factor in the conviction of the defendants. Had the jury foreman, in the rendition of the verdicts in this case, told us in addition that no credence was given to Raymond's testimony, neither should anyone have been surprised nor would the validity of the verdicts have been impaired. His criminal history and his prior inconsistent statements under oath to the grand jury would have been enough to do him in. Looked at in this light, he cannot be regarded as a witness who was critical to the state's burden of proof. Had he been the sole prosecution witness, it is a near certainty that these defendants would not now be moving for new trials. It must not be overlooked, moreover, that this is not a case which resulted in convictions on the basis of evidence presented by the state alone. The defendants pointedly denied putting anything in the Raymond vehicle. Although defendant Binns testified through exhibit 25 and did not testify in person, the jury's rejection of defendant Tooher's testimony had a vicarious effect on defendant Binns. The same is true of the jury's treatment of Piccirillo's testimony. Their abjuration of any wrongdoing put their truthfulness in issue and the jury said that they were not to be believed. In the Court's view, it is wishful to think that the Lancia testimony would change another jury's mind.
As it did with the Bressan evidence, the Court will pass upon Lancia's credibility. Before proceeding, the Court evaluates the argument which defendants make on pages 12 and 13 of their final memorandum. Omitting footnotes, the Court reproduces that argument in major part.
 "The testimony given by Lancia during the course of his deposition supports Defendants' assertions that they did not remove certain items from the Ronci residence and place them in Richard Raymond's vehicle, but that Richard Raymond had indeed committed the burglary. Moreover, certain of the information to which Lancia testified, could not have been obtained from a cursory reading of the materials that Lancia had seen.
 "Lancia testified at page 8 of his deposition that Richard Raymond `had broken into the place by himself by using his car . . .' He continued with his answer `. . . he told me that it had something to do with a piece of wood, and I believe that it was down at the bottom of the door or something of that nature . . .' Although not made explicit at the trial, there were two points of entry into the Ronci residence. During the testimony of Frank Ronci, the owner's son, who responded to the home after being notified by the police that the alarm had sounded and that there had been a break-in, Mr. Ronci testified only as to the window that had been broken and that he had boarded up. No mention was made as to the broken door which led to an isolated room (wine cellar) from which no access could be gained into the remainder of the house. (Tr. page 373) A brief mention of a door was provided by Officer Williams in response to a question on cross examination `Was there door forced?', (sic) responded `Yes.' (Tr. 138) The only other mention of a door was given by Defendant Tooher on cross-examination that when he and Defendant Binns left the Ronci residence, `[t]he wine cellar door. . . had been secured . . .' (Tr. 971). At no time during the trial, nor in Raymond's civil rights complaint or the related pretrial memorandum was a description of the door offered. However, at the hearing on 10 July 1990, Defendant Binns corroborated the description given by Lancia as related to him by Richard Raymond. Unless Mr. Raymond was present at the scene, it is unlikely that he could have accurately described the condition of the door on the night of 30 June — 1 July 1984."
"No mention was made as to the broken door" at the trial by anyone because, contrary to what Lancia said Raymond told him, a wooden door played no part in the break into the Ronci home. Nor did anyone testify that there were "two points of entry into the Ronci residence." Both of these facts were testified to by defendant Binns on July 10, 1990, four years after the trial. His testimony is that his physical examination of the scene on the night of the event comported with the description offered by Lancia. Hence, the defendants would have the Court believe that Raymond smashed into a wooden door with his car to gain entry, that he could not gain entry because the broken door "led to an isolated room (wine cellar) from which no access could be gained into the remainder of the house" and that "it is unlikely that [Raymond] could have accurately described the condition of the door" unless he was at the scene of the break.
Unless Lancia and defendant Binns are engaging in pure conjecture, Lancia is mistaken about what he heard Raymond tell him. When Dennis Plante and Paul Spencer went to the Glocester police station to give a report about the break, they did not tell Williams that they heard a car crash and glass breaking. They said they "heard glass breaking at a house across the pond." [Exhibit 18] Surely if Raymond crashed into a wooden door, found entry unattainable and then broke glass, Plante and Spencer would first have heard wood shatter and then glass breaking. No one testified, as did defendant Binns during this proceeding, that a point of entry in addition to the wooden door, was "[t]he sliding glass unit on the lower level." [Tr. 7/10/90, 1] Williams made it clear that the point of entry was the window which Plante and Spencer heard being broken, testimony which was corroborated by Ronci. [Tr. V.2, 373] The sliding glass door mentioned by defendant Binns had to be, perforce, a point of exit — ostensibly the means through which the large television screen was going to be removed. The defendants considered the "back sliding glass doors" to be significant enough to be photographed. [Tr. V.4, 968] Williams testified he saw broken glass and a door forced even before he entered the residence. [Tr. V.1, 138] He said "they broke a window to get in" and that he "boarded the window where they broke in." [Tr. V.2, 373] And defendant Binns is plainly wrong in testifying:
 "One point [of entry] was a wood, solid wood door approximately two to three inches thick, which led into the lower exterior of the house. It was, once inside there, it was just cement walls all the way around. It appeared to be a wine cellar. There was no way to gain access to the house from that area." [Tr. 7/10/90, 1]
Defendant Tooher says he was inside the Ronci house that morning and that there was a glass door "leading to a wine cellar" [Tr. V.4, 968] and that the "wine cellar door . . . had been secured with a board and the sliding glass doors were just closed." [Id. 971] If, as defendant Tooher says, there was access to the wine cellar through a glass door going from the interior of the house, there must necessarily have been access from the wine cellar going into the house.
The defendants continue with this argument, pointing out specific items which Lancia "could not have obtained from a cursory reading of the materials that [he] had seen" and "that such details only could have been provided by an individual [meaning Richard Raymond] who was present." That Lancia's testimony is detailed in nature is certainly true but those details were not obtained simply from a cursory reading of materials provided by Richard Raymond.
This allusion to "materials" can be bewildering to those unfamiliar with the appearance of Lancia on this judicial scene. In a memorandum filed on December 14, 1988, the defendants identify Lancia as "an accomplished jailhouse lawyer." With that perception, Lancia, at the earliest point in his deposition, sets the stage for the acquisition of information from Raymond. He stated that during the period of his incarceration he had an opportunity to meet Richard Raymond and that the meeting came about in this fashion:
 "Basically, I was trying to gain access to law material to help me in my own matter, and not being able to, I had to file a 1983 complaint in the Federal Court, which became fairly much known by the custodial personnel there, and subsequently the inmates, and Richard approached me on a couple of occasions under what I believe was sort of a little bit of a dupe to acquire my friendship, because he felt that I knew a lot more than he did about filing complaints, or something in the area of law.
 "Q. Did there come a time when Mr. Raymond asked for any information, or for any assistance, in legal matters that related to him?
 "A. Yes.
 "Q. Could you tell us about that?
 "A. As I say, initially it was done under a pretense of just a question here or there, but as time developed, it got to be extensive, to the extent that it encompassed pretty much everything he was thinking about his legal matters in any position."
 [4-5]
Raymond throws additional light on the subject by a letter received by the Court from him on December 13, 1988, a copy of which has been provided to counsel. The Court quotes in pertinent part:
 "Sir, my name is Richard Raymond and I am writing to you concerning the statments (sic) made by James Lancia. It is true that I discussed parts of the Glocester case with Lancia. I let Lancia read a memorandum that was filed in Federal district court by my lawyer Mark Smith. You see Mr. Lancia claims to be somewhat of a jailhouse lawyer. He was interested in some of the law sited (sic) in the memorandum because of an alleged beating of a black person by I.S.C. officials. He was suppose (sic) to file suite (sic) for this person in Federal district court. He still has my memorandum and some other papers of mine."
To say, as the defendants do, that Lancia could not have acquired the detailed information, which he has, "from a cursory reading of the materials that [he] had seen" is true so far as it goes. He certainly has a great deal to say and he had different avenues by which to gather it. Besides testifying that Raymond spoke to him "in great detail" about the civil suit, he said more than once that he had read the complaint which had been filed in federal court. In footnote 8 of the final memorandum, the defendants appear to suggest that Lancia is confused; that it was the pre-trial memorandum which he read and not the complaint. But the Court has no doubt that this "accomplished jailhouse lawyer" knows the difference between the complaint and the pre-trial memorandum and that he read them both. Even one not as adept in such matters as Lancia cannot miss the style in which the documents are plainly entitled.
Those two documents are certainly not the sole sources of information utilized by Lancia. Lancia's reputed testimony is to come not only "from what I read" but also "from everything he [Raymond] told me." [26] What Lancia did not learn from the complaint and memorandum he learned from Raymond. The fact that Lancia knows that two fishermen heard the breaking of glass and that items taken from the Ronci home included a statue and a coin album are not details which necessarily make Raymond the perpetrator of the crime or responsible for the items being in his car. Having been brought out at the trial, such information is public knowledge. If Raymond imparted that information to Lancia — and it is more likely than not that he did — the more persuasive inference is that he learned it at the trial. While he would of course have known about the statue and the coins if he had taken them out of the Ronci home, he could not possibly have known that the two people who could place him at the scene were fishermen who had come off the lake because, according to Lancia, Raymond first saw the two men when they attempted to block the road as Raymond was trying to get away. [9] It has not been shown that Raymond had any occasion to learn before the trial that his registration plate had been reported by two men who had been fishing on the lake. The sole conclusion that one may draw is that he learned these facts at the trial. Even if it is true that he was at the scene of the break, Raymond would not have had a means of identifying the men as fishermen or of knowing where they had come from.
At a time when the Court had not made a judgment on the admissibility of the Bressan and Lancia evidence, it had scheduled the examination of Lancia on his deposition testimony by the prosecution and by the Court. That examination has been thwarted by his flight from the jurisdiction. Nevertheless, the Court has had opportunities to see and to listen to him on the occasions when he did appear. In addition, the Court has observed him on the videotape recording as he gave his deposition in this proceeding on December 4, 1988. In addition to its finding that his testimony is barred by reason of its cumulative and impeaching nature, the Court finds that he is not a credible witness and that the evidence is entitled to no weight.
One standard which jurors are enjoined to invoke in their assessment of the credibility of a witness is their common sense and experience. The Court should do no less.
Lancia had not gone far in his deposition when he diverted in the midst of answering a question to interject this statement: ". . . did I mention first that I in no way ever asked the man [Raymond] any questions . . ." [7] It defies common sense to believe that Lancia obtained such detailed information through a one-way series of spasmodic statements whenever Raymond was moved to speak. The Court is convinced that Lancia volunteered that statement in order to allay any suspicion that he drew out from Raymond sufficient material about the Ronci incident in order to pervert the material to his own benefit. It must be borne in mind that Raymond was not seeking any help from Lancia in order that a complaint would be filed in federal court. Whether, at that time, Raymond was satisfied or not with his attorney's services, the fact is that his attorney had long since filed both the complaint and pre-trial memorandum. There can be no question, whatever Raymond's purpose in approaching this jailhouse lawyer, that a dialogue ensued and that Lancia's statement that he asked Raymond no questions is a falsehood.
That is not the only time Lancia came prepared to insert unasked for material. He was asked:
 "Q. Did he tell you that during the course of this fall that he had actually been injured?
 "A. No, he told me he had not."
 [13]
The question was answered directly and completely. The videotape of his deposition shows that a long pause followed that response during which time counsel appeared to be examining her notes preparatory to framing the next question. Without any question put to him, Lancia added:
 "Then the only other injury that I recollect, if you will, is that either coming into or going out of the cell, I believe he was barefooted and someone stepped on his toes, he really didn't say whether it was intentional or not, but I had the idea that his means of utilizing that particular incident was coupled with the idea that he had fallen down the stairs. For those two reasons, he felt like he had a substantial suit."
 [14]
Later on, this ensued:
 "Q. Did he ever explain to you the circumstances surrounding any one or more of those incidents?
 "A. No, and to be very frank with you, I doubt that I would have wanted to hear it."
Lancia considered that answer as a complete response because, as the videotape again shows, it was followed by a noticeable period of silence. He ended that period of silence by volunteering this:
 "Could I add at that point in time, I guess, then I started to turn my thinking around, in terms of even talking with the man, I'm non-violent myself, but as it turns out, then it started to bother me that he had killed people, based on his own statements to me, which I certainly didn't need, and that he was additionally moving forward into areas that were certainly disruptive, if not totally obliterating honest people's lives and manipulating the system perhaps that wasn't aware of what he was doing, and that's why I basically turned against him."
 [20]
That statement reverberates with the same kind of cynicism and hypocrisy which are to be found in his November 13th letter wherein he said: "I never have used any drugs of any kind, no (sic) do I have any crime of violence on my record where I ever inflicted any physical harm on any person."
Although he has made an attempt in that letter to minimize his conviction for that robbery, the facts tell a different story. Counsel have been notified that the Court would take judicial notice of the papers filed in this court in the case ofLancia v. Moran, KM 90-0449. The proceeding is Lancia's petition for a writ of habeas corpus in his extradition case. Included in the papers is the "Affidavit in aid of extradition." In part, it recites:
 "On January 2, 1982 myself [the affiant] and officer Korn, also of the Fort Lauderdale Police Department, responded to an armed robbery in the progress (sic) at the Gold and Silver pawn shop located at 2631 East Oakland Park Boulevard, Broward County, Florida. Upon our arrival we saw the victim, Christopher A. Perrone, inside the business holding a gun at a subject, later identified as JAMES THOMAS LANCIA. I removed the gun from Mr. Perrone and secured it. A search of both Mr. Perrone and JAMES THOMAS LANCIA revealed no other weapons and that JAMES THOMAS LANCIA had a gun shot wound in his right forearm. Mr. Perrone was subsequently found to be the owner of the Gold and Silver. Mr. Perrone advised us that JAMES THOMAS LANCIA has (sic) pawned a few pieces of jewelry earlier in the week. He further explained that JAMES THOMAS LANCIA contacted him on this date and stated he would like to get his jewelry back. Mr. Perrone then stated that he produced the jewelry JAMES THOMAS LANCIA had pawned and a bill for said jewelry. Mr. Perrone stated that he thought JAMES THOMAS LANCIA was pulling his wallet from his back pocket when in fact he produced a gun and pointed it at him. JAMES THOMAS LANCIA demanded all of Mr. Perrone's money. Mr. Perrone gave JAMES THOMAS LANCIA approximately $900.00 dollars in cash. JAMES THOMAS LANCIA then took Mr. Perrone into the back room area of the business and started to tie him up. Mr. Perrone at this point broke free from JAMES THOMAS LANCIA and took the gun away from him. Mr. Perrone then stated that he fired one shot at JAMES THOMAS LANCIA after he refused to stop coming at him. JAMES THOMAS LANCIA was struck in the right forearm. A search of JAMES THOMAS LANCIA was performed before being transported to the hospital for treatment which revealed approximately $940.00 dollars in cash in his right front pocket."
Apparently Lancia's concept of the infliction of personal harm is too narrow to include tying up an individual from whom he had just taken money at the point of a loaded revolver. Both the state and the defendants have provided the Court with some of Lancia's criminal career. He is not averse to violence. On May 25, 1965, he was convicted and sentenced for the crime of robbery upon one individual (Indictment 33579), and assault with intent to rob another (Indictment 33578). In addition to his conviction and sentence for the January 2, 1982 robbery in Ft. Lauderdale, he received a consecutive 15 year sentence for a robbery in Seminole County, Florida.
This man has testified that he "turned against" Raymond because Raymond had done things "that were certainly disruptive, if not totally obliterating honest people's lives and manipulating the system . . ." He is the same man who, not a month into his eighteenth year, stole someone's automobile in Providence and, seven months later, stole another automobile in Joliet, Illinois. How sensitive he is to the obliteration of other people's lives and the manipulation of the system is best demonstrated by his forgery of his own mother's name on a check he drew against her account (Indictment 33653); by his conviction for being a common cheat and by his numerous convictions for forgery, obtaining money under false pretenses and the like. It also appears from the records provided by the defendants that acapias is also outstanding on a charge that he has defrauded a Broward County individual of $7500 by misrepresenting himself as a legal clerk. His perfidious nature is all the more accentuated by the various aliases he has used in his efforts to deceive: Antonio J.C. Simas; Gerald O. Forten; Thomas James Lancia; Jimmy LaVance and James Thomas Lancier. It is plain to see from the number of times he has escaped from custody that while he has no compunction about being a cheat and a robber he takes whatever course he can in order to avoid the consequences of his acts.
He has done the same in this case. He has volunteered to present his manipulation of some of the facts obtained from Raymond in an attempt to avoid extradition. He has sought to make it appear that his extradition had to do with a technicality; that while on probation he simply failed to pay a $50. court-ordered assessment. The truth appears in a letter dated February 22, 1989 written by counsel for the defendants to the District Court. She reported to the judge involved in the district court extradition proceeding that "although the Broward County arrest warrant had arisen from a technical violation of probation and an obtaining money under false pretenses charge, the second warrant had resulted when Lancia, free on recognizance after the grant of a motion for a new trial, had failed to surrender to resume serving a long sentence after the new trial order was vacated." The letter went on to say that Seminole County, where a fifteen year consecutive sentence awaits Lancia, as well as Broward County, was pursuing extradition.
Lancia's letter of November 13th clearly contemplates a bargain being struck. The defendants argue that any selfish motive which prompted the letter was eradicated by his appearance at the deposition of December 4, 1988. Subsequent events have rendered that argument untenable. While in prison, Lancia was prepared to present facts given to him by Raymond but with the modifications he crafted in order to provide himself with something to trade. When he was free on bail and for as long as the potential existed that he would testify for the defendants in return for non-extradition, it was to his advantage to remain available and at the same time be with his family. That potential disappeared when the Court informed him he would be required to testify in this proceeding on a given day whether or not the extradition proceeding had been decided. When the given day arrived with the extradition proceeding unresolved, Lancia failed to appear as he had promised. There is no question that he has fled the jurisdiction.
It is no great surprise that he has done so. He is now forty-seven years old. He has spent a considerable part of his life in the prisons of various states. His return to Florida imprisonment was a certainty. He had obtained no response to his offer to "relat[e] my respectful requests in return for this information." He did once more what he had done so often in the past — he escaped and at the same time he cheated those members of his family who had posted his substantial bail which the Court has ordered to be forfeited. The defendants have lost nothing by his flight. What he had to say which might have been of help to them was not the truth.
The defendants themselves should have some question about Lancia's veracity. Illustrative of the facility with which Lancia could convert statements made by Raymond to Lancia's own advantage is Lancia's testimony about the two juveniles to whom, Raymond said at the trial, Raymond had loaned his car. According to Lancia, Raymond told him that he made up a story to the Glocester police to the effect that he had loaned his car to "two boys" * * * "with the names of John and Bob" [24] and that Raymond had picked those names because "as he was talking to [the police] he was directly facing the picture of Bob and John Kennedy and he said their names were Bob and John." [25]
Two things may be considered as certainties. The first, if defendant Tooher is believed, is that Raymond refused to give the names of the two juveniles to the police. [Tr. V.4, 862] He further testified that he never did obtain the names of the juveniles. [Exhibit 25, 29-30] The second is that there was no picture of Robert and John Kennedy at the police station. The Court must come to this latter conclusion because defendant Binns took the stand on July 10, 1990 to confirm Lancia's testimony about "a piece of wood" but failed to sustain Lancia about the picture. The entire import of Binns' appearance that day was to show that Lancia had facts that only Raymond could have known. Had such a picture been there, defendant Binns would have said so. It might be argued that Lancia is just repeating what Raymond told him — true or false. But if Raymond was confiding in Lancia as Lancia would wish one to believe, what purpose would it serve Raymond to lie on a completely insignificant point? In giving his deposition testimony, Lancia obviously felt secure in the belief that the only person who could contradict him on the point was Raymond. But defendant Binns' silence on this phase of Lancia's testimony is sufficient contradiction. It should be very apparent that Lancia's testimony about the two juveniles is manufactured testimony and since he would go to that length on a matter so irrelevant how can any faith be placed on the genuineness of anything he might say on any matter more critical?
This man who has decried Raymond's manipulations has himself succeeded thus far in manipulating the judicial system by his misrepresentations to the Court.
Lancia appeared before the Court on Monday, June 25, 1990, in response to a subpoena issued by counsel for the defendants as directed by the Court. His appearance was required in order to be examined by the assistant attorney general and by the Court. Lancia requested the Court's indulgence that he not be compelled to testify in this proceeding until his petition for writ of habeas corpus was decided where it was pending in Kent County. The Court was informed that the hearing on his petition was scheduled for the following Wednesday, June 27, 1990. The Court, concerned about what appeared to be an inordinate delay in the disposition of the extradition proceedings, ordered the Department of Attorney General to appear before it the following morning and further ordered Lancia to be in attendance at that time.
On Tuesday morning, June 26, 1990, Ms. Susan Tobin, a representative of the Attorney General in charge of extradition matters appeared before the Court.
The following colloquy occurred:
 "THE COURT: Are you in a position to tell me why more than a year has elapsed and this matter has not been resolved in Kent County? Do you know the reasons for the delay?
 "MS. TOBIN: From the best I can tell, your Honor, he failed to appear in Third Division to turn himself in on the warrant back in February of '89. And Judge Dennis issued another warrant for him. The warrant was — the governor's warrant was not executed until April of 1990. And according to the prison and our office in Kent County, our office agreed to $30,000 double surety."
 [Tr. 6/26/90, 10]
The following question was addressed to Ms. Tobin and not to Lancia:
 "THE COURT: Are you familiar with the facts of the case to the extent you would be able to tell me more particularly about what transpired between February 14, 1989 when the governor signed the warrant and April of 1990? Was Mr. Lancia — how should I put it? Did he fail to appear for that entire period on the warrant that was issued for him by Judge Dennis? Was it not executed?
 "MR. LANCIA: No.
 "THE COURT: If you can't tell me, I'm going to ask Ms. Schiff.
 "MS. TOBIN: I cannot tell you that, your Honor.
 "THE COURT: Ms. Schiff?
 "MS. SCHIFF: Your honor, Mr. Lancia appeared timely for the hearing in front of Judge Dennis. I was present at that particular hearing. If my memory serves me correct, Mr. Lancia pointed out a — Mr. Lancia and his counsel at the time pointed out several flaws in the warrant. Judge Dennis actually dismissed Mr. Lancia from the courtroom and told him that he was free to go. After consultation with Captain DeFeo of the Warwick Police Department in chambers, Mr. DeFeo pointed out something to Judge Dennis which made Judge Dennis issue a request that Mr. Lancia reappear later that day.
 "MR. LANCIA: I'm sorry, but if I could get a chance to speak.
 "THE COURT: You will."
 [Id. 11-12]
 * * *
 "THE COURT: Now, Ms. Schiff, were you in the courtroom when Judge Dennis did that?
 "MS. SCHIFF: I was in the courtroom when Judge Dennis did that. I was present. Mr. Lancia's attorney at that time was Mary Ciresi. Mr. Lancia left the courtroom, left the Court building because Judge Dennis had dismissed him. It was after, as I said, consultation in chambers with Captain DeFeo of the Warwick Police Department that Judge Dennis requested Mr. Lancia appear later that afternoon. Mr. Lancia was not — since he had left, could not have been informed of that request that he appear. When he did not appear that afternoon, Judge Dennis issued a warrant for him and that I believe is the failure to appear warrant that Ms. Tobin is speaking of.
 "THE COURT: Now, did you want to say something, Mr. Lancia?
 "MR. LANCIA: Yes, please. If your Honor please, the entire matter has been misrepresented by the State to be sure. Her knowledge, and I beg your pardon, is very minuscule on the entire matter. Your Honor, what factually took place, I'm presently in position (sic) of a writ of habeas corpus to be granted me initially going back to when I was first arrested on the complaint. From the request of the State, I was made to appear in Court before Judge Dennis. Consequently I was held for the first 30 days period of time. For a lot of reasons I ended up with a bail hearing sometime after that, and I put up — it's not 30,000 with surety, it's double surety, and I put up that bail before the Court at that time, and I have a transcript of that. * * * So, then what took place was Judge Dennis asked me to come back to Court. I did this. This is not speaking of the matter which Ina is talking about. A few days later — and Judge Dennis clearly let me go that day. I left, but no one ever got in touch with me anyway and since that period of time, your Honor. * * * I have not been in hiding, your Honor. And this is wholly representative in my petition. I have been working every single day at the same job I had when this all began; and moreover, I have lived at the same address with my wife and daughter. I have done no hiding in any manner, shape or form and no one gave me any knowledge whatsoever of a bench warrant. A bench warrant in fact wasn't issued by Judge Dennis."
 [Id. 12-14]
 * * *
 "THE COURT: This matter is before Judge Sheehan, isn't it?
 "MR. CRAVEN: Correct, tomorrow, your Honor, yes.
 "MR. LANCIA: So I mean, I personally don't like to give away my strategical defense for all the — in that particular Court. But with the Court's assistance, I hope, it could grant giving me time in this matter. I'll be glad to give you that information. What I just gave you is a factual accounting.
 "THE COURT: I'm only interested in your extradition proceeding because I want to get this matter that is before me completed; and in order to do that, I want to take your testimony. And you're reluctant to testify until the extradition proceeding is complete as I understand it.
 "MR. LANCIA: I'm not reluctant to. It's just that it was asked of me so quickly and my proceeding coming up tomorrow, it was important for me to have that little time with all the confusion that is going on. I would be more than glad to give it at the end of the week if you would like, your Honor.
 "THE COURT: Well, we'll set your testimony down for Thursday, whether your Honor — whether Judge Sheehan hears you tomorrow or not.
 "MR. LANCIA: Yes."
 [Id. 15]
The Court was thereupon informed that counsel for the defendants could not be in attendance earlier than the following Friday, June 29, 1990.
 "THE COURT: Then we'll set it down for Friday. We'll take Mr. Lancia's testimony Friday morning. Do I have anything else on the calendar Friday morning, Mr. Clerk?
 "THE CLERK: No.
 "THE COURT: Mr. Lancia, be here at ten o'clock Friday morning.
 "MR. LANCIA: Yes, sir. Thank you, your Honor."
 [Id. 16]
This extended recitation of what transpired in Lancia's presence on June 25 and 26, 1990 makes clear that Lancia would have his opportunity to obtain a decision on his petition in Kent County before he testified in this proceeding but not beyond June 27. No matter what, he was obliged to be present on Friday, June 29th to be examined. He did not appear.
He told the Court a half-truth when he stated that after Judge Dennis gave him permission to leave "no one got in touch with me." And it was false for him to say to the Court "no one gave me any knowledge whatsoever of a bench warrant."
In her letter to the district judge on February 22, 1989, counsel for the defendants also said this:
 "On Sunday, February 12, 1989, Lancia telephoned my office to advise me that he knew that a governor's warrant had arrived from Florida and that he was scheduled for a hearing in the district court on February 14, 1989. I told Mr. Lancia that I would be in the district court on that date to witness the proceedings.
 "On February 14, 1989, I was present in the district court when the Lancia case was called. My understanding of the proceedings is that the Court acknowledged the receipt of the governor's warrant and indicated its intention to hold Lancia without bail. After the argument by Mary June Ciresi, Lancia's counsel, that Lancia was not a flight risk and had met his previous obligations to appear in court, the Court acknowledged that there had been no problem with Lancia since his release on bail on November 29, 1988 and suggested that counsel for the State and for the defendant arrange for a hearing date with the Superior Court. The Court stated that Lancia could leave. A short time later, Captain William DeFeo and a deputy sheriff emerged from the Court's chambers and sought Lancia, who had apparently left the building. Captain DeFeo indicated that the clerk had informed the Court that Lancia could not be released on bail in this district court and should have been taken into custody and brought before the Superior Court.
 "On the evening of February 14, 1989 and again on the morning of February 15, 1989, Lancia telephoned me. On both of these occasions, I advised him to contact his attorney and suggested to him that his best interests would be served if he surrendered himself to the Court. I told Lancia that I could not give him any legal advice; however, as a person who was familiar with his situation, I told him that he should surrender without delay. Lancia told me that he would contact his attorney. I have not been contacted by Lancia since that time."
Nor was Lancia telling the Court the truth when he stated that "a bench warrant in fact wasn't issued." Lancia v. Moran, supra,
contains the transcript of Lancia's bail forfeiture hearing held on February 23, 1989. Judge Dennis recounts: "Now on February 14, 1989, the defendant was to have reported to Court at 1:00 p.m.; he failed to do so; a Bench Warrant was issued; he was ordered held without bail." In view of the advice given to him on two occasions by counsel for the defendants that he "surrender[ed] himself to the Court," there can be no question that Lancia knew that Judge Dennis had issued a bench warrant.
Faced with the prospect of extradition and long prison sentences to be served in Florida, Lancia has chosen to escape. The Court has observed him sufficiently to say that his conduct is in keeping with his character. His life has been one of violence, deception and manipulation of others. His testimony regarding Richard Raymond is totally unworthy of belief.
 IV. The newly discovered evidence provided by the existence of a federal investigation into the fraudulent pattern of conduct by Richard Raymond and Molly Raymond.
This phase of defendants' argument, first submitted as item IIIB. of the initial memorandum, appears to relate to Raymond's testimony that he had been assaulted by the defendant Binns but seems, too, to be an attempt to attack not only Richard Raymond's general credibility but Molly Raymond's as well. In that sense, if the Court correctly understands the argument, this evidence exposes their mendacity and necessarily, they say, will probably result in the acquittal of the defendants.
The Court, in spite of its reluctance to extend this decision, considers it necessary, in the first instance, to point out once again assertions of fact which find no support in the record which the defendants have submitted to the Court in their effort to be granted a new trial. Their contentions in this area are of a scattershot nature and do not lend themselves to easy summarization. In order to meet these errors of fact and, at the same time, to be certain that the propositions advanced are not being taken out of context, the Court reproduces the arguments in full. They first appeared on pages 11-13 of defendants' initial memorandum and, apart from some significant changes, were essentially repeated when the defendants filed their amended motions for a new trial on April 20, 1990 and their final memorandum on July 25, 1990. The defendants begin:
 "As the result of continuing, post-trial investigation, Defendants' counsel has developed evidence that Richard Raymond and Molly Raymond (both of whom testified for the State at trial) had been engaging in interstate fraud activities involving false claims of personal injury and staged `accidents' in public places.
 "Defendants have established that, in early 1984, the Federal Bureau of Investigation had developed evidence of a continuing scheme involving Richard Raymond, Molly Raymond, and others. Essentially, this scheme involved the staging of slips, falls, and other accidents in stores and buildings in order to collect damage settlements. Prosecution of this case was discontinued when a key figure in the investigation, Roland Despers, a known narcotics trafficker and associate of Richard and Molly Raymond, was murdered. (Despers' body was discovered floating in the Blackstone River; no one has yet been charged in this crime.) However, the FBI's investigative reports and files are extant.[9]"
Footnote 9 informed the Court that the Federal Bureau of Investigation files were available for presentation at an evidentiary hearing. They were submitted to the Court on April 17, 1990 in connection with a collateral matter within the scope of these motions.
The words "in early 1984" were changed in the final memorandum to "in the early 1980s." The change is significant, although it could have been made even more specific because the FBI investigation alluded to in the second paragraph began in September, 1981. It serves, too, to exclude any other FBI investigation conducted "in early 1984" or at any other time before 1984.
To put it as mildly as possible, for the defendants to say that the FBI investigation involved a scheme of "the staging of slips, falls and other accidents in stores and buildings in order to collect damage settlements" is a gross overstatement. The FBI files show most clearly that the targets of their investigation were not Richard and Molly Raymond but Roland Desper (not Despers) and his girl friend, Diane C. Loiselle. The FBI described the character of the case as "fraud by wire" and it concerned the receipt of $9000 by Desper following an incident which occurred in an Almac's store on February 3, 1981.
What the FBI developed was not "evidence of a continuing scheme" but evidence of a single fraudulent act. In the course of that investigation Richard Raymond admitted to the FBI that he spilled some baby oil on the floor of an Almac's market by pre-arrangement with Desper and that Desper slipped on it. Sheila Haworth admitted to the FBI that she was present for the purpose of witnessing the fall. Molly Raymond admitted to the FBI that she knew of the scheme and was there when Desper "fell". All three told the bureau agents that Diane Loiselle knew of the plan but left the store after inducing Haworth to be in the store to scream for help. Desper's statement to an agent was that there was no collusion with anyone and that the money he received was for a legitimate injury. Loiselle gave a signed statement on October 9, 1981. It is a bland statement from which the best inference to be drawn is that the occurrence was a surprise to her.
Contrary to what the defendants say, prosecution of the case was not discontinued because of the death of Desper. The Court has been provided with no documentation that Desper has died, let alone that he was the victim of a murder. One note in the FBI's investigation file, dated April 28, 1982, states that the case had been presented to a federal grand jury. Another note, dated August 31, 1982, reads that an assistant United States attorney "stated that he would seek an indictment against Desper when the grand jury that heard the evidence comes in again." If there is any doubt that it was not Richard Raymond, or his wife Molly, who were the targets of this federal investigation, that statement by the prosecuting attorney should put the doubt to rest.
A letter dated August 29, 1983 sent by the supervisory senior resident agent and addressed to the United States Attorney for this district tells the true reason why "[p]rosecution of this case was discontinued . . ." The letter reads:
 "Re: Roland Antonio Desper; "Dianne (sic) Constance Loiselle; "Fraud By Wire
 "This is to confirm a conversation between United States Attorney (USA) Lincoln C. Almond, Assistant United States Attorney (AUSA) James E. O'Neil, and Special Agent (SA) Richard A. Cleary on August 4, 1983. At that time, the facts of the above-referenced investigation were discussed. It was pointed out that a lengthy period of time had transpired between the date that the original information on this investigation was presented to the Federal Grand Jury and present. It was the opinion of AUSA O'Neil and yourself that an indictment of Desper and/or Loiselle not be pursued at this time.
 "In view of the above opinion, no additional investigation is being conducted by the FBI."
Nothing in that letter remotely suggests that the FBI investigation terminated because of Desper's death.
The third paragraph of defendants' argument recites:
 "Further post-trial investigation by Defendants' counsel has developed information concerning another slip-and-fall claim in which Molly and Richard Raymond received a settlement from Liberty Mutual Insurance Company as the result of an incident in a Blackstone, Massachusetts supermarket. In addition, Defendants are prepared to present evidence regarding other attempts by the Raymonds to stage similar personal injury scams against other firms and to solicit the participation of other persons in these schemes."
Since the second sentence of that paragraph remains essentially unchanged in the amended motions and final memorandum, the Court shall deal with it first.
The defendants cannot pick and choose the evidence which they wish to disclose to the Court and which evidence they "are prepared to present" but have not done so. There are motions for a new trial filed on the ground of newly discovered evidence which are capable of being decided on written submissions alone. There are others which may require evidentiary hearings. A court cannot foretell whether evidentiary hearings are necessary unless it is first provided with properly authenticated statements. In the instant matter, the Court itself felt it necessary to take the testimony of a large number of witnesses. It permitted the defendants to file whatever they wished to file and to present any witnesses they wished to present. The Court shall not, however, give any recognition at all in this proceeding to the kind of presentation that constitutes the second sentence of their third paragraph, particularly in view of the defendants' propensity to overstate and misstate given sets of facts. In deciding the instant motions, the Court considers all the written documentation and the testimony of the witnesses who have appeared before it. Whatever evidence the defendants may possess but have not disclosed is of no value to the Court.
There is no evidence in this case that "Richard Raymond received a settlement from Liberty Mutual Insurance Company as a result of an incident in a Blackstone, Massachusetts supermarket." There is evidence in the case that Molly Raymond received $35,000 after she fell in an Almac's market. She so testified in a deposition given by her on June 4, 1990. It was also her testimony that a myelogram taken after the fall revealed that she had a ruptured herniated disc. At this point in their argument, as well as in their amended motions, the defendants say that this is evidence of the staging of "another slip-and-fall claim." It is to be noted that in arguing later on in their final memorandum, the defendants have changed the first sentence of their third paragraph to say:
 "Further post-trial investigation by Defendants' counsel developed information supporting the inference that a claim successfully pursued by Richard Raymond against the Wrentham State School was yet another fraudulent scheme.[14]"
The defendants preserved their argument about Molly Raymond in their final memorandum, nevertheless, by adding footnote 12 at the end of the first paragraph of their argument reproduced above under this section IV. Footnote 12 reads in its entirety:
 "Defendants took the depositions of both Molly and Richard Raymond. Mrs. Raymond stated that her fall in an Almacs Supermarket was a legitimate `accident' — a fact disputed by Diane Loiselle in her deposition. When questioned about his participation in Molly's accident in Almacs, Richard Raymond refused to answer Defendants' counsel's questions, invoking the Fifth Amendment privilege against self incrimination.
 "Defendants assert that had the Raymonds similarly asserted their Fifth Amendment rights at trial, the impact on their credibility may very well have changed the verdict."
Not surprisingly, the defendants contend that Molly Raymond's fall was not a legitimate accident. They choose to believe Diane Loiselle's testimony that Mrs. Raymond told her that her fall was a "staged" fall. The Court is not so receptive. This is not to say that the Court believes Mrs. Raymond's testimony. The circumstances of her falling on a puddle of liquid detergent so closely parallels Roland Desper's fall on a puddle of baby oil spilled intentionally by Mr. Raymond is enough to raise anyone's eyebrows. It is to say, nonetheless, that the Court finds Diane Loiselle not to be a credible person.
In the course of her statement to a federal agent on October 9, 1981, Diane Loiselle said: "I didn't go into Almac's at all but I went shopping in Warwick Zayre's next door to Almac's."
In her deposition of December 17, 1988, reciting the events immediately preceding the fall of Roland Desper, she said under oath:
 "Well, I walked in the store with them at first. It was Bo and Molly and that girl Sheila walked in first. I don't know Sheila's last name. Then it was Roland, and I that walked in after them. Everyone was high on cannabinol. I kept telling Roland don't do it, don't do it. You're too high. They're going to know you're high. Bo and Molly kept coming up to the carriage and that was when I said —
 "Q. We're talking about a shopping cart?
 "A. Shopping cart, yeah — that was when I said I'm leaving. So, the girl Sheila took my place to say she was his girlfriend, so that there was a witness there witnessing the fall to make it look —
 "Q. More legitimate?
 "A. To make it more secure, he had a witness seeing him fall, and Bo and Molly walked — they went to the baby oil aisle. * * *"
 [17 — 18]
If Diane Loiselle told the truth to the federal agent on October 9, 1981, she committed perjury on December 17, 1988 and violated section 11-33-1 of our criminal statutes. If she spoke falsely to the federal agent, she violated a federal criminal statute, section 1001 of title 18 of the United States Code.
If the legitimacy vel non of Mrs. Raymond's fall is a material issue in this proceeding, the defendants have failed to sustain the issue sufficiently to merit consideration by another jury. Whether it is a material issue at all shall, of course, be resolved in due course.
The Court points to the remaining two sentences of footnote 12. It does not escape the Court's attention that the defendants have subtly translated Richard Raymond's invocation of the Fifth Amendment privilege — the assertion by one individual — into their averment that "had the Raymonds similarly asserted their Fifth Amendment rights at trial, the impact on their credibility may very well have changed the verdict" — the assertion of the privilege by two individuals. The clear imputation here is that the defendants' post-trial investigation has compelled Richard Raymond to exercise his right not to incriminate himself and had he done so at the trial "their credibility may very well" have caused the jury to acquit the defendants.
Nothing in the record before the Court reveals that Mrs. Raymond has asserted her Fifth Amendment privilege. To the contrary, she confessed her part in the Desper's "scam" to the FBI and testified before the federal grand jury about the matter. Since the defendants have not shown that the United States charged her with perjury because of that testimony, it is to be concluded that she told the grand jury the same things that she told the federal agent. Which is more than can be said for Diane Loiselle.
In a memorandum from Special Agent Cleary to the Special Agent in charge dated June 25, 1982, it was reported that on April 28, 1982 an Assistant United States Attorney "had witnesses Sheila Haworth and Molly Raymond present the facts of this [the Desper] matter to the Federal Grand Jury. At that time he also called Dianne (sic) Loiselle as a witness, however, Dianne Loiselle refused to testify." Bearing in mind that Loiselle and Desper were not husband and wife, Loiselle's refusal could be based solely upon her Fifth Amendment privilege.
The defendants seem to be of the belief — incorrectly the Court might add — that the assertion of the privilege by Richard Raymond in the course of his deposition of April 30, 1990, and in their view such an assertion by Molly Raymond too, gives rise to an adverse inference against the asserter. If that were a sound proposition, the Court would be compelled to draw an adverse inference against Loiselle, were she an otherwise credible witness, because she took advantage of the Fifth Amendment as has Richard Raymond. Contrary to what Loiselle told the FBI, Richard Raymond, Molly Raymond and Sheila Haworth each placed Loiselle inside the Almac store. Following the logic of the defendants, the Court would be compelled to infer that Loiselle refused to testify because if she told the grand jury the truth she would prove her October 9th statement to be false. Alternatively, if she repeated her October 9th statement and told the grand jury she had not gone into the store, she ran the risk of being charged with perjury.
It must be made clear that not only did both Raymonds testify at the trial without pleading the Fifth Amendment but that in 1981 both of them gave statements voluntarily to the FBI which incriminated them in the Desper incident. On the record before the Court, it was only Loiselle who sought the protection of the Fifth Amendment in refusing to testify about the Desper incident before the federal grand jury — and that circumstance occurring after she had told a federal agent in effect that what happened to her boyfriend was all news to her. The sole instance in which Richard Raymond claimed the privilege, insofar as the Court has been made aware, was at the deposition called for by counsel for the defendants and conducted on April 30, 1990.
But this exercise in logic is all beside the point. If there were a second trial of these defendants and the Raymonds were called to testify, an invocation of the privilege by either of them would not be a matter of which the jury would be made aware. In Commonwealth v. Greene, 445 Pa. 228, the Pennsylvania Supreme Court held that a jury may not draw any inference from a witness's exercise of the Fifth Amendment privilege. In relying upon Bowles v. United States, 439 F.2d 536 (D.C. Cir. 1970) the Pennsylvania Court said, at 231:
 "Reviewing the principle that the jury may not draw any inference from a witness' (sic) exercise of his constitutional rights whether the inference be favorable to the prosecution or the defense, the [Bowles] court applied the corollary to this rule that a witness should not be placed on the stand for the purpose of having him exercise his privilege before the jury. We are in agreement with these principles and we conclude that the court below properly refused to allow Williams to take the stand." (Emphasis in the original)
What the United States Supreme Court had to say on the subject in Slochower v. Board of Education, 350 U.S. 551 (1956) is instructive.
 "At the outset we must condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment. The right of an accused person to refuse to testify, which had been in England merely a rule of evidence, was so important to our forefathers that they raised it to the dignity of a constitutional enactment, and it has been recognized as `one of the most valuable prerogatives of the citizen.' Brown v. Walker, 161 U.S. 591, 610. We have reaffirmed our faith in this principle recently in Quinn v. United States, 349 U.S. 155. In Ullmann v. United States, 350 U.S. 422, decided last month, we scored the assumption that those who claim this privilege are either criminals or perjurers. The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury. As we pointed out in Ullmann, a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." [At 557]
In spite of the defendants' captious approach to the taking of the Fifth Amendment by Richard Raymond to certain questions during his deposition of April 30, 1990, the Court will draw no adverse inferences from Loiselle's use of the Fifth Amendment before the federal grand jury. Her credibility remains impaired, nevertheless, because of her conflicting testimony which has been provided to the Court by the defendants.
Moving on now to the sentence which the defendants changed to assert "yet another fraudulent scheme" by Richard Raymond arising against Wrentham State School, the defendants direct the Court to footnote 14. Footnote 14 says:
 "Raymond asserted that he had struck his head, breaking his vehicle's windshield in a minor car accident on the school grounds. Raymond's supervisor advised police that Raymond's assertion was false, where he had previously shown her his cracked windshield, stating that his wife, Molly Raymond, had cracked the windshield during an argument."
As to this argument, the only evidence which has been provided to the Court is in Richard Raymond's deposition of April 30, 1990 and Diane Loiselle's deposition of December 17, 1988.
Nowhere in the Raymond deposition does he state that he struck his head on the windshield thereby breaking the windshield. Raymond described the automobile collision at Wrentham State School as "head on" and the damage to the vehicle as "[f]ront-end damage, windshield I think." He described his injuries as "[h]ead and back." There is nothing in the record to support the contention that the windshield was broken other than because of this collision. The supervisor who is referred to is not identified, if there is a police report containing the supervisor's statement it has not been produced and the defendants appear not to have pursued discovery in this area. Raymond denied telling Pamela Pickett that the windshield had been broken by his wife. Who Pamela Pickett might be is left to conjecture.
Loiselle had something to say about the Wrentham affair but it is clear that her knowledge, even if her testimony were reliable, is second-hand knowledge. Her boyfriend, Roland Desper, told her that Raymond was in a car accident. She described it as a rear-end collision. She was asked:
 "Q. * * * Do you know whether the car accident was a legitimate car accident?
 "A. Yeah, probably, but there was no injuries. He faked the injuries again.
 "Q. So that, although it might have been truly an accident, and not something planned, Bo turned the situation to his advantage . . .
 "A. Yup.
 "Q. . . . by claiming a back injury . . .
 "A. Yup.
 "Q. . . . or a neck injury, or both?
 "A. Yup."
 [26 — 27]
Of course, there is nothing in Loiselle's deposition to give credence to any of these rash statements. There is no question that Loiselle is in no position to say whether the Wrentham collision was a fraud or not and whether Raymond sustained any injuries or not. And whether Molly Raymond broke the windshield or whether it broke when her husband's head hit it is of small moment. As questionable as one might suspect his claim to be, the fact is that the Court has not been given any evidence to cast doubt upon Richard Raymond's testimony that there was nothing fraudulent about the Wrentham collision. He certainly draws support from the eminent neurological surgeon who took care of him: Julius Stoll, Jr.
Doctor Stoll's deposition testimony reveals that he examined Richard Raymond for the first time on February 2, 1981. Part of the medical history taken at the time included that:
 "On [January 11, 1981], he was driving and was involved in a head-on collision, was thrown forward and struck his head against the mirror and windshield, felt lightheaded, developed neck and back pain and right chest pain. He went to the infirmary at Wrentham State Hospital where he was examined and discharged. On the way home, he felt more lightheaded. He stayed home and then went on two occasions to Woonsocket Hospital Emergency Room. He continued with his discomfort, and I did have a note from the emergency room." [6]
He testified about the working diagnosis he was able to form on May 21, 1981:
 " * * * I felt he had a head injury with a concussion on the basis of the alterations of consciousness and the blow on the head, . . ." [8]
During that year, Raymond underwent two myelograms which revealed a ruptured disc. On February 18, 1982, an electromyelogram was performed. From these diagnostic procedures, Doctor Stoll established a diagnosis of a herniated disc and performed a laminectomy on April 28, 1982. [9-17] It is not precisely clear from the record whether the disc injury was related to the vehicle collision but Dr. Stoll's testimony, when viewed in its entirety, makes it appear to be so. Much more persuasive on this point, however, is the defendants' admission as revealed later in their argument, that they knew at the trial "that Richard Raymond had suffered a back injury in parking (sic) lot of the Wrentham State School." Evidently the defendants, in acknowledging the existence of Raymond's back injury, should place the same lack of faith in Loiselle's credibility as the Court has repeatedly expressed. Were there no other reason, the presumptuousness and the arrogance of her remark that Raymond "faked the injuries again" would suffice to discredit anything she has to say to the Court.
The argument proceeds.
 "Evidence of the leadership roles of Richard and Molly Raymond in continuing schemes of this kind is admissible under Rule 404(b), R.I.R.Evid. State v. Sepe, 410 A.2d 127, 130-31 (R.I. 1980). See also Huddleston v. United States, ___ U.S. ___, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); United States v. Bank of New England, 821 F.2d 844 (1st Cir. 1987). Such evidence not only would impeach the credibility of Richard and Molly Raymond but, more importantly, it would support a persuasive theory that Richard Raymond, assisted by his wife and given a literally golden opportunity by Williams' assault, used this prosecution to pull off yet another personal injury scam, this time against the Glocester Police Department.
 "Trial testimony established that approximately two hours elapsed between the time James Williams beat Richard Raymond and the time Raymond first complained of paralysis. In light of the newly discovered evidence concerning other Raymond schemes, the jury would likely draw the inference from this delay that, sitting in his cell after the Williams beating, experienced con-man Richard Raymond saw the potential for another phony injury scheme and sought to put it into effect.
 "Other newly discovered evidence supports this inference. Richard Raymond's uncle, Alberic Raymond, told Defendant's investigator that James Williams and Richard Raymond had several long meetings in front of Alberic Raymond's house and that after such meetings, Richard Raymond told his aunt and uncle that Williams would help him get `big money' from the Town of Glocester. Williams, facing criminal prosecution for unrelated charges, and Raymond shared a mutual interest. Prosecution of the Defendants would create an opportunity for Williams to trade his testimony for immunity in this this (sic) matter and dismissal of pending charges in another. To Raymond, prosecution of the Defendants was the key to the Glocester town treasury and the payoff of the biggest scam of Raymond's extensive if not particularly successful criminal career. Defendants submit that a jury would likely infer the prosecution of Defendants and the testimony of Williams and both Raymonds resulted from the common (and criminal) aims of Richard Raymond and James Williams."
The defendants here maintain that the Raymonds were the motivating force for "continuing schemes" resulting in the filing of fraudulent claims and that evidence of this fact is admissible under R.I.R.Evid. 404(b). The Court will, in time, discuss the admissibility of such evidence in spite of the fact that this question is capable of summary disposition. First of all, the Court reads the evidence to establish but one event in which the Raymonds collaborated with Desper to cheat anyone. Because Loiselle's testimony has been rejected, the defendants have failed to persuade the Court that the Raymonds engineered the Desper claim or that the respective claims of Richard and Molly Raymond were anything but legitimate. There is, therefore, no evidence of their "leadership roles" or of "continuing schemes" to be admitted at a new trial. Secondly, to the extent such evidence might be impeaching, our cases say that that is not a ground upon which a motion for a new trial may be granted.
Ignoring for the moment the repetitive infusion into their argument that Williams' assault triggered the chain of events leading to the defendants' convictions, the point is introduced that Molly Raymond "assisted" her husband in "pull[ing] off yet another personal injury scam." It is a bald assertion. Mrs. Raymond testified at the trial as a prosecution witness. Her appearance was not a voluntary one for the purpose of strengthening her husband's claim. She was compelled to appear by force of the state's subpoena. Not a word of her testimony permits an inference that she gave her husband any assistance so that he might pursue a fraudulent claim against the Glocester police department.
Keeping in mind that this area of the defendants' argument concerns Richard Raymond's testimony that Binns, as well as Williams, assaulted him, Molly Raymond's testimony involved two general areas. One area had to do with the efforts she made to prevent the police from taking away the Raymond automobile and the other with the events leading up to the eventual signing of the release by her husband and himself. Such evidence as she gave about her observations of the condition of her husband's body when she saw him at Rhode Island Hospital was corroborated by two neutral observers: Doctor Stoll [Exhibit 2] and Attorney Neil Philbin. [Tr. V.2, 341] Photographs, which one would infer would display the body condition, were taken at Rhode Island Hospital by Mrs. Raymond's mother [Id. 516] and Attorney Philbin [Id.
344-345] The closest one might say she came to assisting her husband was when she said that defendant Binns told her that he had hit her husband in the leg with the nightstick "after they had fallen down the stairs." [Tr. V.3, 532]
Her testimony assisted defendant Binns more than it did her husband. She told the jury that defendant Binns told her the same thing which Binns told the jury: that whatever injuries Raymond sustained were the result of a fall down the stairs and not because of an assault. She also told the jury that defendant Binns said that when he came to her home to arrest her husband he had a warrant for Raymond's arrest but did not show it to her. [Id. 536] If she had been intent on helping her husband build a false claim out of his encounter with the Glocester police, she could have testified that defendant Binns told her that it was James Williams who struck her husband before the defendant and Raymond fell down the stairs. After all, by the time she took the stand Williams had already admitted assaulting her husband. She could have embellished upon Williams' testimony by attributing statements to defendant Binns that Williams had battered Raymond more severely than having slapped him on the back of the head and twisting his wrist.
When Molly Raymond's testimony is taken as a whole, it must be concluded that she added nothing to her husband's supposed pre-conceived plan to benefit financially from his "golden opportunity [given to him] by Williams' assault."
There is much in the facts of this case to expose the avowal of the Raymond-Williams linkage as spurious. The defendants must face up to the fact that it was not Williams alone who testified before the grand jury which returned this indictment against them. If Williams' grand jury testimony played any part in the assault charge being brought against defendant Binns, the defendants cannot ignore the fact that Raymond is reported to have told a Glocester policeman "[Binns] whacked me a little bit but Williams whacked me even more." [Tr. V.1, 23] The idea of a Raymond-Williams conspiracy to "get" the defendants so that Raymond could dip into the town treasury and Williams be freed from criminal prosecution is far-fetched. While the defendants studiously avoid it, the fact is that long before the defendants were indicted, Richard Raymond released any claims he may have had against "the Town of Glocester and/or the Town of Glocester Police Department." [Exhibit 21] It is a certainty, too, that even had the defendants never been indicted, they as well as Williams, Driscoll and the town would have become defendants in Raymond's civil rights action. As will be related later in this decision, he let it be known even before the First Circuit decision in Rumery v. Town of Newton, 778 F.2d 778 (December 2, 1985), that he planned to sue in spite of the release of August 1984. As for Williams, at the time that the release was signed, he was in good graces as one of the boys on the small department undoubtedly without any idea that in a few months he would be under indictment. This gossamer theory of conspiracy finds its source in the "several long meetings in front of Alberic Raymond's house," a source which the Court has already discredited. Evidently the defendants are not quite sure about the accuracy of Alberic's statement that the meetings took place in front of his house because they do not attribute that location to Alberic in their amended motions but insert it again in their final memorandum. The conspiracy theory to be found in the initial and final memoranda in these sentences:
 "Williams, facing criminal prosecution for unrelated charges, and Raymond shared a mutual interest. Prosecution of the Defendants would create an opportunity for Williams to trade his testimony for immunity in this this (sic) matter and dismissal of pending charges in another. To Raymond, prosecution of the Defendants was the key to the Glocester town treasury and the payoff of the biggest scam of Raymond's extensive if not particularly successful criminal career. Defendants submit that a jury would likely infer the prosecution of Defendants and the testimony of Williams and both Raymonds resulted from the common (and criminal) aims of Richard Raymond and James Williams."
was scuttled with the substitution in the amended motions of this sentence:
 "Defendants submit that, in light of the newly discovered evidence, it more (sic) likely than not that the jury would have drawn the inference that Raymond's desire to exploit this episode for cash and Williams' desire to get revenge on the police chief merged to fuel the prosecution of Defendants."
which, of course, presents an entirely different, if not more chimerical, theory.
The defendants conclude this argument that Raymond pursued "another phony injury scheme" caused by "the Williams beating" with a backward glance at Raymond's past medical history. They say in their initial memorandum:
 "Further supporting this inference is newly discovered evidence that Richard Raymond knew he would display evidence of neurological deficits even in the absence of injury and could present symptoms of neurological injury at will. While both the State and the Defendants knew that that (sic) Richard Raymond had suffered a back injury in parking (sic) lot of the Wrentham State School, evidence of the extent of Raymond's injuries as a result of the beatings administered by Officer James Williams was not material to the charges against Defendants and would not be admissible at trial in any event, where its prejudicial effect outweighed its relevance. R.I.R.Evid. 403.
 "The discovery of the FBI's investigation of the Raymonds' slip-and-fall scams and other evidence of a pattern of fraudulent schemes and plans executed by Richard and Molly Raymond, Defendants submit, now renders this evidence material, relevant, and admissible[.] Defendants have made additional inquiries and are prepared to present evidence, including expert medical testimony, that:
 "Richard Raymond's prior spinal injuries and surgical treatment would have resulted in his display of abnormal responses to the simple diagnostic techniques used to screen for neurological injuries in the field and at hospital emergency rooms;
 "As a result of normal post-operative follow-up, Raymond would have been aware of his ability to present such symptoms; and
 "In cases where patients with histories like Raymond's decide to engage in fraud, such persons can frequently and successfully present symptoms of serious neurologic impairment, even in the absence of such injury."
It follows, they say, that:
 "Under these circumstances and only on the basis of evidence newly-developed since trial, Richard Raymond's claims of back injury at work, in various public places, and during each of his prior arrests by the Rhode Island State Police and the Glocester Police Department would be admissible at a new trial as proof of motive, intent, preparation, plan, knowledge, or absence of mistake, under Rule 404(b), R.I.R.Evid. Similarly, Raymond's threats to sue the officers involved in these prior arrests would also be admissible.
 "Thus, credible, newly discovered evidence would support the inference that Defendants and the Town of Glocester were the targets of the schemes of Richard Raymond, aided by James Williams, for different but equally compelling reasons. Again, given the closeness of the case and the `very, very suspect' (Tr. 1149) nature of the determinative evidence against Defendants, Defendants submit that such evidence would lead to their acquittal at a new trial."
As in other instances to which the Court has previously adverted, this argument is re-stated in their final memorandum but contain changes in their amended motions.
The Court has not been informed by the defendants why the first and last memoranda acknowledge that the defendants knew that Raymond "had suffered a back injury in [the] parking lot of the Wrentham State School" but say, in their amended motions, simply that he "had suffered a back injury prior to 1984."
In their initial memorandum, they submit that besides the "slip-and-fall scams" discovered by the FBI's investigation, there is "other evidence of a pattern of fraudulent schemes and plans executed by Richard and Molly Raymond." Perhaps because they had not produced that evidence, they omitted that averment from their amended motions. And then, still failing to disclose what that "other evidence" is, they make the allegation again in their final memorandum.
The initial memorandum speaks of Richard Raymond's claims of "back injury at work, in various public places, and during each of his prior arrests by the Rhode Island State Police and the Glocester Police Department"; the amended motions speak only of "back injury during his prior arrests by the Rhode Island State Police and the Glocester Police Department" and the final memorandum both broadens and limits their contention in saying "back injury at work, in various public places and during his prior arrest by the Glocester Police Department."
The initial memorandum says that Raymond threatened to sue the officers involved in "these prior arrests" by the Rhode Island State Police and Glocester Police and that fact should be shown to another jury. The defendants forsake that position in their amended motions. It re-appears in the final memorandum but although the sole arrest referred to is by the Glocester police, the defendants again state that Raymond threatened to sue the officers involved in "these prior arrests."
The defendants have made representations to the Court which first appeared in their amended motions and which they then abnegated in their final memorandum. One representation was:
 "Defendants submit that, in a pattern paralleling developments in the instant case, Raymond used a minor traffic accident as the basis of a scam."
Another was the following:
 "More importantly, Defendants are now prepared to present evidence that Raymond successfully faked back injuries in connection with prior claims and that he trained others in these techniques."
When the defendants submitted their initial memorandum on October 24, 1988 and their amended motions on April 20, 1990, they represented that Raymond had pursued claims of back injury "during his prior arrests by the Rhode Island State Police and the Glocester Police Department." Since they did not specify how many times each of the departments had arrested Raymond, that representation could be safely interpreted to mean that each department had arrested Raymond at least once. When those representations were made, Raymond had not yet been deposed by the defendants. That event occurred on April 30, 1990. When the defendants submitted their final memorandum on July 25, 1990 they stated, at footnote 15:
 "After Raymond's deposition was taken, Defendants learned that Raymond had complained of back injuries following his arrest in February 1984 by other Glocester police officers."
It would appear, then, that the defendants knew of an arrest by the Glocester police department before October 24, 1988, that they learned, after April 20, 1990, of an arrest by that department in February, 1984, and that each of these arrests resulted in claims by Raymond that he injured his back. Since Raymond also claims to have hurt his back during the arrest of July 1, 1984, it is the defendants' contention that Raymond's prior claims are admissible "as proof of motive, intent, preparation, plan, knowledge, or absence of mistake." At least two prior arrests are important to their case. What is perplexing, if such evidence is admissible, is their statement in the final memorandum where they refer to a single arrest in saying, "Raymond's claims of back injury at work, in various public places, and during his prior arrest by the Glocester Police Department." (Emphasis added)
These observations by the Court demonstrate a lack of focus in the argumentation by the defendants and a concomitant uncertainty about the factual underpinnings of their motions for a new trial.
In this final phase of their argument where the defendants concentrate on Raymond's "prior spinal injuries and surgical treatment" and his ability to falsify "symptoms of serious neurologic impairment" they say that they depend upon the deposition testimony of Doctor Stoll. In the Court's view, neither the broadest reading nor the most liberal interpretation of Doctor Stoll's testimony would validate the propositions that simple diagnostic techniques would reveal neurological injuries, that Raymond knew he had the ability to present such symptoms and that people like Raymond, i.e., people who are fakers, are able to present symptoms of "neurologic impairment, even in the absence of such injury."
Before Doctor Stoll got into the area of Raymond's physical condition as of July 1, 1984, he gave extensive testimony about his diagnosis and treatment of his patient for the Wrentham State Hospital automobile collision of 1981. Later on, he said he also treated Raymond for a period of time for a motor vehicle accident in September, 1983. A repeat myelogram performed by the doctor on November 13, 1983 produced normal findings. [22] This was, as far as the record before the Court discloses, the status of Raymond's physical condition on June 30, 1984.
When Raymond was taken to Rhode Island Hospital on July 1, 1984, he was first seen by Doctor Stoll's associate, Doctor Welch. Doctor Stoll did not examine the patient until July 2, 1984. The nearest approach to the substantiation of defendants' argument from Doctor Stoll's testimony is the following sequence:
 "Q. With regard to a diagnosis, did you come to a working diagnosis with regard to the history, both from Dr. Welch, as well as your examination of Mr. Raymond the following day?
 "A. I did, I had a working diagnosis. Number one, there was (sic) certain inconsistencies in that examination as his objective findings go. That is, originally, when he came in and when I examined him, his reflexes were intact. Now, apparently when Dr. Welch examined him, the patient said he could not move his lower extremity and he did not perceive the pinprick up to about the level of the groin. When I examined him the following day, he was up and about and walking, and the question really was, did he have a contusion in the lower part of his spinal cord, or nerve roots, or was it an anxiety reaction, but whatever it was, he was treated immediately upon admission with a cortisone derivative called Decadron, and so by the time I saw him, he was up and around and walking, and whether the Decadron had apparently cured this man that quickly, I had no way of being sure, except that his examination, as far as his injury to his nervous system, it was essentially intact, but to fully investigate it, at a later date I did a total myelogram on him and that was normal." [33-34]
 * * *
 " * * * My opinion is that either he had a contusion of that lower part of the cord, or it was an anxiety reaction and my reason for saying that is that normally, with a contusion, it causes someone to be unable to move their legs and not feel to a certain level, the reflexes should be absent and in his case, they were present. Furthermore, by the following day, he was up and around and walking, and it would be unusual for a contusion of at least any consequence, for someone to recover that quickly. Granted, he was treated and properly so with Decadron, which obviously helps reduce swelling from a bruise in the brain or spinal cord, so of course, I am unable to totally differentiate the inconsistencies after the findings, but either he did have a contusion, or some of it was anxiety.
 "Q. With regard to the anxiety, is one able to fake an anxiety, assuming that information we discussed is true, if you know.
 "A. Certainly, his inability to move the legs could be real or it could be fake. Sensory findings are subjective, not objective. And, the reason I'm saying this is because the reflexes were intact. If they had been absent, too, then I would have had actual objective findings, but the two didn't quite jive. Now, I can't deny he might have had bruising of the Cauda Equina. I have no way of proving that but, there were some inconsistencies in the clinical findings found by Dr. Welch and myself." [35-36]
 * * *
 "Q. Doctor, you indicated two possibilities of his complaints, one was contusion and the other was an anxiety reaction, isn't there a third possibility too?
 "A. Well, there could have been a factor —
 "Q. Could he have been faking it, Doctor?
 "A. Yes, he could have.
 "Q. So, that would be the third possibility?
 "A. Yes."
 [45]
Nothing in Doctor Stoll's testimony legitimately permits the defendants to tell the Court that "[i]n cases where patients with histories like Raymond's decide to engage in fraud, such persons can frequently and successfully present symptoms of serious neurologic impairment, even in the absence of such injury." The apparition of fraud that hovered over Doctor Stoll's testimony never materialized. Small wonder that the defendants jettisoned the claim they made in their amended motions that they were "prepared to present evidence that Raymond successfully faked back injuries in connection with prior claims and that he trained others in these techniques."
The record which the defendants have provided the Court falls considerably short of evidence that Richard and Molly Raymond engaged in a pattern of conduct "involving false claims of personal injury and staged `accidents' in public places." It is a structure built on the quicksand of Loiselle's testimony and an FBI investigation into herself and her boyfriend Roland Desper. It is rife with conjecture, innuendo, suspicion and hyperbole. In short, it lacks that substance which would warrant the convening of a second jury.
 V. Admissibility of evidence of fraudulent schemes. A. Admissibility under R.I.R. Evidence 404(b).
The Court has found that the defendants have not sustained their position that Richard and Molly Raymond engaged in a practice, "in the early 1980s", of profiting from sham personal injury claims. They came no closer to that contention than to show that the Raymonds assisted Roland Desper in doing so. The Court now considers the admissibility of that kind of evidence if a new trial were granted.
Here the defendants say:
 "Rule 404(b), Rhode Island Rules of Evidence, like its federal counterpart, provides that `[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'"
All but one of the cases cited by the defendants in support of the admission of the Raymonds' "[o]ther crimes, wrongs, or acts [ ]" are from federal circuits. United States v. Bank of NewEngland, N.A., 821 F.2d 844 (CA 1 1987) needs no discussion. The evidence was admitted because it was probative of the defendant's "intent" which is a specific "purpose" authorized by 404(b) for its introduction. Johnson v. Brewer, 521 F.2d 556
(CA 8 1975) was decided on due process grounds and not on the basis of 404(b). It held that extrinsic evidence may not be excluded to show bias even where collateral matter is involved.United States v. Stockton, 788 F.2d 210 (CA 4 1986) dealt with rule 404(b) in a rather unusual manner — in a footnote. It is in footnote 15 on page 219 from which the defendants extract the following language which they describe as the Fourth Circuit's holding:
 "Although impeachment of a witness is not among the `other purposes' explicitly listed in Rule 404(b) by way of example, the list is not exhaustive, and impeachment qualifies as a permissible purpose for the introduction of other crimes."
Be it the court's holding or not, the Fourth Circuit gives no clue, other than its own say so, of the footing for that statement. It is not in accord with this Court's view of the purpose to be served by rule 404(b). First of all, the Fourth Circuit made no effort to explain how the witness could be impeached for "other crimes" presumably attributable to the defendant when the witness herself could not be impeached under rule of evidence 609. In Stockton, the witness testified in the grand jury about the defendant's conduct and stated that she had received threats prior to her appearance before the grand jury from the defendant's wife and associates. At trial, her testimony regarding the defendant's conduct was inconsistent with what she had told the grand jury. The district court permitted her to be impeached by her grand jury testimony concerning the defendant's acts but went further and admitted those portions referring to threats made to her by the people other than the defendant. Who was being impeached, and why, by the "threat" testimony, the circuit never got around to explaining. One supposes that it was directed at the defendant. It certainly could not have been the witness who was being impeached since she was the recipient and not the maker of the threats.
This Court does not subscribe to the proposal that impeachment is "a genuine `other purpose'" for rule 404(b) objectives. While the purposes listed in the rule for which such evidence may be admitted are not exclusive, a purpose must bear some relation to or to some degree illuminate the conduct of the actor. Thirteen years before rule 404(b) became effective in 1987 in the Superior Court, our Supreme Court said in State v. Ryan,113 R.I. 343, that any exception to the general rule "may be received when it is interwoven with the offense for which defendant is being tried, or directly supports a finding of guilty knowledge in the perpetration of that offense." [349] This Court has used the term "actor," rather than the word "defendant" advisedly, because that is the term used in dicta inHuddleston v. United States, 99 L Ed 2d 771 (1988), the last of the cases cited by the defendant. Huddleston decided a single question: that the district court is not required to make a preliminary finding that the prosecution has proved the "other act" by a preponderance of the evidence before it submits the evidence to the jury. At 780, Chief Justice Rehnquist shed light on the reason for the rule with these comments:
 "Federal Rule of Evidence 404(b) — which applies in both civil and criminal cases — generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct. The actor in the instant case was a criminal defendant, and the act in question was `similar' to the one with which he was charged. Our use of these terms is not meant to suggest that our analysis is limited to such circumstances."
The general rule is, then, that evidence of "extrinsic acts that might adversely reflect on the actor's character" are not admissible. Such evidence may be admitted, nevertheless, for any exception stated within the rule and where such evidence "may be critical to the establishment of the truth as to a disputed issue." Because a witness's veracity is always at issue and because impeachment of that veracity affects the truth-finding process, for the Fourth Circuit to say that impeachment is "a genuine `other purpose'" is to say that rule 404(b) may always be used to impeach a witness. With that interpretation, the exception swallows the rule.
In any event, the Court concludes that Rhode Island Rule of Evidence 404(b) does not permit the introduction into evidence of either Richard or Molly Raymond's fraudulent schemes had they been shown to be guilty of such. The federal and state rules are not identical. Chief Justice Rehnquist may well have been correct in using the term "actor" because, unlike our rule, the federal rule does not allude to a "defendant." Where federal rule 404(b) ends, our rule continues with the concluding clause: "or to prove that defendant feared imminent bodily harm and that the fear was reasonable." A plain and natural reading of the two sentences of rule 404(b) persuade that the exceptions of sentence two applicable to the general exclusion of sentence one may be used only against a defendant in a criminal case. Otherwise, the word "person" in the first sentence would have to be imported into all of the second sentence except with regard to the final clause which uses the word "defendant." That construction, the Court submits, is incongruous and tortured.
 B. Admissibility as an affirmative defense.
The defendants claim that the evidence of "fraudulent schemes" is admissible at a new trial as an affirmative defense. The argument is made:
 "[ ] Defendants assert that they have an absolute entitlement to present and to prove an affirmative defense at any new trial. This defense is that Richard Raymond, an accomplished personal injury scam artist, used the opportunity presented by his arrest, the conduct of James Williams, and the assistance of fired officers Williams and Knight, to perpetrate another personal injury scam. Defendants submit that, with the testimony of Diane Loiselle, FBI agents, and other law enforcement officials concerning Raymond's key roles in organizing and leading other scams, this interpretation of the evidence is at least as credible as theory (sic) proffered by the State. Importantly, this evidence of Raymond's professionalism and prior experience in such frauds was not available to Defendants at their first trial. Defendants assert that such evidence is the kind of evidence which is verdict changing not because it impeaches Raymond but because it is probative of a previously unavailable theory."
Before considering admissibility, the evidence itself must be identified. No evidence has been provided that Knight assisted Raymond "to perpetrate another personal injury scam." There is no "testimony of * * * other law enforcement officials concerning Raymond's key roles in organizing and leading other scams." Any reliance on the FBI files is misdirected because they reveal that Desper and Loiselle and not Raymond were the targets of their investigation. What evidence, then, must be taken into account as if it were true?
First, there is Loiselle's deposition. In it she says that Raymond masterminded the Almac's store fall by Desper and that Raymond and his wife had staged a number of pseudo accidents. She also says that the injuries Raymond received at Wrentham State School were faked. Since the former testimony is possibly based on personal knowledge, it perhaps is not barred as hearsay at least. The latter testimony is based on what Desper told her and is not competent in any event. In addition, even if she were present to view the Wrentham collision, she, like any other lay witness, is not qualified to say whether the injury testified to by Doctor Stoll was genuine or not.
Then there is the meeting had between Raymond and Williams as reported by Raymond to his uncle and aunt, Alberic and Alice Raymond — the meeting in which Williams was going to help Raymond get "big money."
It is this quantum of evidence which the defendants have available "to present and to prove an affirmative defense at any new trial * * * that Richard Raymond * * * used the opportunity presented by his arrest, the conduct of James Williams, and the assistance of fired officer [ ] Williams * * *, to perpetrate another personal injury scam." In short, the defendants are saying that they have "an absolute entitlement," by way of an affirmative defense, to show that Raymond's arrest produced no "physical injury" and that he is involved in just "another" scam.
According to the evidence presented on these motions, Raymond's civil rights litigation was based mainly on false arrest, false imprisonment and excessive use of force by Glocester policemen. When the defendants urge their right to an affirmative defense, they are really speaking about two counts brought against defendant Binns. Raymond claimed in his civil suit that he was arrested and imprisoned without a warrant. The state charged defendant Binns with filing a false document — a falsified arrest warrant. Raymond claimed in his civil suit that he was assaulted by Williams and the defendant Binns and other unknown Glocester officers. The state charged defendant Binns with assault on Raymond. The jury convicted defendant Binns on both counts. The Court having acquitted him on the false document count, the sole count on which an affirmative defense could apply is the assault. This analysis makes it apparent that defendant Tooher has no standing to claim an affirmative defense because he was not charged with assaulting Raymond and that the affirmative defense does not pertain to their convictions for obstruction of justice and conspiracy to obstruct justice. It may be argued, nevertheless, that the number of counts in the indictment on which the state was put to its proof produced a diversity of evidence any combination of which could have coalesced in the convictions of both defendants for obstruction of justice and conspiracy. It is for this reason that the Court will give a liberal interpretation to the defendants' view that the evidence of fraudulent schemes, narrowed as it has been by the Court, is evidence which both defendants have a right to present as an affirmative defense.
The proposition is advanced that this evidence is presentable at a new trial because "it is probative of a previously unavailable theory" in view of the fact that "this evidence of Raymond's professionalism and prior experience in such frauds was not available to Defendants at their first trial." Their interpretation of the evidence, their argument continues, "is at least as credible as [the] theory preferred by the state."
It is of little assistance to the Court for the defendants to refer to a "theory preferred by the state." The trial record plainly shows that the prosecution relied on a number of arguments which, in its view, warranted guilty verdicts upon the conspiracy and obstruction of justice counts. These evidentiary theories, so to speak, were presented to the Court at the close of the state's case [Tr. V.3, 601-634] and to the jury in the state's final summation. [Tr. V.6, 31-43] The prosecutor made it abundantly clear that he was drawing upon evidence relating to free-standing counts and bringing that evidence to bear to justify convictions on the counts charging conspiracy and obstruction of justice. As to each defendant, he told the jury that "all or one or some of the following acts" [Tr. V.6, 34] and "any one or all of the following acts" [Tr. V.6, 39] constituted an obstruction of justice. He drew a line at only a single count when he said that the charge of larceny against defendant Tooher " * * * is the only offense that's not related to obstruction of justice * * *." Neither the prosecution, nor the defense, nor the Court is in a position to identify with certainty the evidentiary ingredients that were persuasive of guilt. It is, hence, impossible for the defendants to say that their presentation of their affirmative defense would reverse the convictions of conspiracy and obstruction of justice.
In a memorandum filed on December 14, 1988, the defendants spelled out their affirmative defense in this way:
 "At a new trial, to prove this defense, Defendants will call Richard Raymond, Molly Raymond, Diane Loiselle, agents of the Federal Bureau of Investigation, and other witnesses. Defendants will establish that Richard and Molly Raymond were accomplished at preparing and executing fraudulent personal injury claims and profiting from them. Defendants will further establish that the Raymonds had used a common scheme successfully to deceive physicians, claims adjusters, investigators, and attorneys. Defendants will show that the personal injury frauds and the incidents which gave rise to the convictions of Defendants shared a common pattern with schemes previously executed by Raymond and his wife in the past. Rather than a petty-ante (sic) thief and drug user victimized by the Defendants, Richard Raymond, the evidence will show, was capable of executing a complex fraud and of manipulating the situations similar to the case at bar."
In a memorandum filed on December 28, 1988, the defendants omitted the first sentence of that paragraph. Even as finally stated, and perhaps more so since the Court does have the FBI files and Loiselle's deposition, the affirmative defense is fraught with generalities. Before the defendants acquire their claimed entitlement to present their affirmative defense they must first be granted a new trial. In addition to the attributes already discussed which newly discovered evidence must have to qualify for the grant is that "[t]he evidence must be material to the issue." (Cite omitted) Carsetti, supra, at 651 and 171, respectively.
 "Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial. What is `in issue,' that is, within the range of the litigated controversy, is determined mainly by the pleadings, read in the light of the rules of pleading and controlled by the substantive law."
 Cleary, Mc Cormick on Evidence § 185 (West 1984)
The "schemes previously executed by" the Raymonds, if proved, would establish them as personal injury brigands. The defendants have failed to show how such proof "share[s] a common pattern" with "the incidents which gave rise to the convictions of Defendants." More than that, the defendants do not — because they cannot — identify which incidents gave rise to their convictions. On its face, evidence of the prior conduct of the Raymonds presented as an affirmative defense does not bear on any issue which required proof by the state. There is no explanation by the defendants how their proof that the Raymonds have been the habitual defrauders of others constitutes a defense to any of the crimes of which either of them has been convicted. There appears to be no commonality, as the defendants say there is, between themodus operandi of the Raymonds and the conduct for which each defendant was found guilty. Wharton's Criminal Law (14th Edition 1978) says at 204:
 "There are two kinds of defenses: ordinary defenses and affirmative defenses.
 "In respect of an ordinary defense, the defendant has the burden of going forward with evidence thereof. If the defendant succeeds in raising the defense, the burden of persuasion is on the prosecution to disprove such defense beyond a reasonable doubt.
 "In respect of an affirmative defense, the defendant not only has the burden of going forward with evidence raising the defense, but also has the persuasion burden of establishing such defense by a preponderance of the evidence." (Footnotes omitted)
With these statements in mind, it is indiscernible how the claimed affirmative defense might even be tangentially material to the defendants' convictions for obstruction of justice and conspiracy to obstruct justice and to defendant Binns' conviction for simple assault. Although the defendants clothe the evidence of the Raymonds' purported manipulative and cheating conduct in the garb of an affirmative defense, what they are really urging is that they be granted a new trial so that they may show the reasons for Richard Raymond's testimony that the defendant Binns struck him. They are not suggesting, for example, that their conduct, though otherwise criminal, is protected conduct by reason of their being police officials. They are suggesting that the Raymonds were motivated in their testimony, as the defendants have said before, in order to "use [ ] this prosecution to pull off yet another personal injury scam, this time against the Glocester Police Department." That kind of evidence is not the stuff of which an affirmative defense is made. It is not an affirmative defense which they wish to mount, a defense which as they frame it would not be material to any issue in the indictment; they wish to show motive on the basis of evidence of which they say they were not previously aware.
 C. Admissibility to show Raymond's motive.
Parties in any trial, civil or criminal, have an absolute right to explore and present to the jury a witness's motive or interest for giving testimony. It is a right the exercise of which must be given great latitude in deference to a criminally accused. But even as to a defendant in a criminal trial, the right has its limitations. The argument which the defendants make that the prior fraudulent schemes of Richard and Molly Raymond ought to go to a second jury presents the Court with the question of the limitation of the right. The Court finds that such evidence does not warrant a grant of these motions. Even if these motions were to be granted for other reasons, the Court finds that evidence of the Raymonds' prior fraudulent schemes ought to be excluded even though, in some very remote fashion, they may bear on the motive of Richard and Molly Raymond in giving their testimony.
At a second trial, the state would be obliged to prove the defendants guilty of conspiracy and obstruction of justice. The defendant Binns would face once again the charge of simple assault. It is very evident from the various memoranda that when the state rests its case the defendants, whether one calls it an affirmative defense or by any other term, will proceed to call witnesses for the purpose of presenting the "fraudulent schemes evidence." The defendants have said how this will be done. "At a new trial, * * * Defendants will call Richard Raymond, Molly Raymond, Diane Loiselle, agents of the Federal Bureau of Investigation, and other witnesses." Based on the record made on these motions and the arguments submitted by the defendants, the jurors at a second trial would be asked to listen to those named individuals and at least the following: Doctor Julius Stoll, Jr.; Doctor Paul Welch; the supervisor at Wrentham State School; United States Attorney Lincoln C. Almond; former Assistant United States Attorney James E. O'Neil; Special Agent Richard A. Cleary; Special Agent James F. Bubela; Supervisory Senior Resident Agent Joseph E. Smith; Sheila Haworth; Susan Fortin of Almac's, Inc.; Linda Montano of Liberty Mutual Insurance Company; John Cloutier of Almac's, Inc. and unnamed witnesses from Royal Globe Insurance Company and the Massachusetts Industrial Board. There will be "other witnesses" called, whose identities the Court cannot divine from the record, who will testify to the deception which the Raymonds perpetrated on "physicians, claims adjusters, investigators and attorneys." The keepers of the records of Almac's, Inc.; Liberty Mutual Insurance Company; Royal Globe Insurance Company; the Massachusetts Industrial Accident Board and Wrentham State School will respond to subpoenas ducestecum. In short, with the completion of the state's case, another trial will begin, a trial in which the focus will not be on the conduct of the defendants but on the conduct of Richard and Molly Raymond. To what end, one might ask? The defendants answer: "[to] establish that Richard and Molly Raymond were accomplished at preparing and executing fraudulent personal injury claims and profiting from them [ ]"; that they "had used a common scheme successfully to deceive physicians, claims adjusters, investigators and attorneys [ ]" and that they "[were] capable of executing a complex fraud and of manipulating the situations similar to the case at bar." In sum, the defendants will accomplish no more than impeach the credibility of the Raymonds.
The people of this state have as much right to have this indictment fairly tried as do the defendants and this procedure to which they claim an "absolute entitlement" is a denigration of that right. It is a time consuming diversion which would amount to nothing more than a demonstration to the jury that Richard and Molly Raymond are not the kind of people who should be believed. The defendants submit this proposal as a basis for a new trial without the slightest knowledge whether the jury convicted the defendants of conspiracy and obstruction of justice by having accepted the testimony of Robert Knight and having already rejected the testimony of the Raymonds. If this evidence is material to any issue at all it is only to the extent that it may show that the testimony of Richard and Molly Raymond had its foundation in the profit which (once again, the defendants say) was expected to be gained through the civil rights action which Richard Raymond initiated in federal court. From that conclusion, the jury then draws the inference that the stake which the Raymonds had in the successful culmination of the Raymond lawsuit renders untrue any evidence they gave about defendant Binns' assault and battery.
The defendants had available to them at the trial much more direct evidence and, in the Court's judgment, much more persuasive evidence from which the jury was enabled to draw the same inference with a much less expenditure of trial time. To develop this point, it is necessary for the Court to set out what the defendants knew, or should have known, when Richard Raymond took the stand on July 14, 1986 followed by his wife on July 15, 1986 at the trial of these defendants.
At their trial, the jury was informed that in August, 1984, both Raymonds executed a release prepared on behalf of the town of Glocester. [Exhibit 21] By it, Richard Raymond understood that he had avoided being imprisoned as a violator of a suspended sentence and being charged with a new crime. In return, he and his wife made a commitment that neither the town nor its police officers would be sued for any supposed illegal acts incidental to his apprehension on the night of June 30, 1984. Some very significant events occurred after the execution of that release which the defendants could have utilized to show at their trial that Richard Raymond had acted in bad faith and had broken his word. It could have been shown to the jury that even though he escaped going to jail he was planning on cashing in on his arrest by suing the defendants. Such evidence certainly would have permitted the jury to infer that the Raymonds were testifying from a selfish motive.
The defendants had evidence available to them at the trial that within three months after the Raymonds signed the release, Richard Raymond made a statement that a lawsuit was in the offing. When, on April 28, 1986, the state mailed to counsel for the defendants its answers to their motions for discovery, there was supplied to the defendants a report made by Rhode Island State Trooper Walter G. Anderson, Jr. dated January 21, 1985. The report says in its entirety:
 "On January 21 ST, (sic) 1985 I was advised by Lt. Caruolo to make out this report as to any information that a Mr. Raymond may have passed on to me relative to Glocester Police Department.
 "I met with Mr. Raymond late November of 1984 reference to drug dealing in the Woonsocket area, this information was passed on to our Detective Division of our department. During this period of time the above informant related to this author that he was filing a law suit against the Glocester Police Department for brutality. This Trooper did not ask for any details of the case, or what charges Glocester had arrested him on."
When Raymond made that statement to Anderson exhibit 21, in this federal district at least, was presumptively valid and enforceable so as to bar Raymond from bringing his civil rights action against the defendants. It was not until December 2, 1985, when the First Circuit decided Rumery, supra, that a release of federal constitutional rights such as exhibit 21 is void abinitio. Then within weeks before the jury's impanellment in this case, Raymond let it be known that his conversation with Trooper Anderson was not idle chatter. On June 3, 1986, he filed a claim with the Glocester town council, in compliance with section45-15-5, R.I.G.L. 1956, in the amount of three quarters of a million dollars. The basis of his claim as recited in that statutory notice could not be more simply or more clearly stated:
 "Your petitioner respectfully represents that on or about June 30, 1984, while Richard Raymond was a suspect, arrestee and incarcerated in the Town of Glocester by the Glocester Police Department for allegations of criminal violations against the State of Rhode Island he was falsely arrested, false (sic) charged, beatened, battered, kicked, punched and otherwise physically abused by members of the Glocester Police Department which was then under the supervision of Chief Richard B. Tooher."
On June 29, 1990, the defendant Binns was asked whether he had been made aware that such a claim has been presented to the town council. He testified: "First I knew of anything to do with a claim was when I was served." He went on to express his belief that the service he referred to was of the process relating to the federal court litigation and not to the statutory notice. The defendant Tooher, who had preceded the defendant Binns to the stand, was neither asked about nor volunteered his knowledge of the claim. It is beyond question, however, that the defendants are chargeable with knowledge of the existence of the statutory claim. They were proceeding to trial in July, 1986. They had information as of April, 1986, that Raymond had said that he planned to bring suit. Defendants also knew at the threshold of trial that the general release of August, 1984, could not be used as a bar to such a suit. These facts should have alerted the defendants, as they would have alerted any reasonable person, to inquire of town officials whether the claim required by law to be submitted had been filed by Raymond and, had it not been, to request such officials to give them notice of such a filing whenever it occurred. Had the defendants followed this course when they received Trooper Anderson's report in April, 1986, there is no doubt in the mind of the Court that town council president Comber would have complied with the defendants' wishes as soon as she received Raymond's claim on June 9, 1986. President Comber was co-operative with defendant Binns' wife when Mrs. Binns learned that Lancia had sent the letter to town treasurer John Driscoll in November, 1988. Mrs. Binns testified that upon learning of the letter she asked Mrs. Comber to provide her with a copy and Mrs. Comber obliged.
The Court assumes that Raymond's cross-examination did not involve this notice of suit because neither defendant knew that one had been filed with the town council. Had the defendants been diligent in this regard, the jury could have been told, through cross-examination of Raymond, that he enjoyed the benefit of the general release by not going to jail as a violator and not being charged for breaking and entering, to boot, but showed himself to be an ingrate by going back on his promise not to bring suit. From the Court's point of view, this kind of evidence has a more direct impact and carries more persuasive power with the jury than the "fraudulent schemes evidence" which the defendants contend they have a right to present. Unless, of course, the real reason the defendants want to use the "fraudulent schemes evidence" is simply to show that the Raymonds are persons of bad character.
The evidence that Raymond was on his way to suing the defendants was available for use by the defendants at their trial. It is not possible for the Court to say that this is so but there is some indication in the trial record that the defendants were not ignorant of the filing of the statutory notice and may have made a decision not to make an issue of it. When Raymond was under direct examination by the state the following information was developed:
 "Q. Now do you have the release, do you recognize State's Exhibit 21 for Identification?
 "A. Yes, this is the release that we signed.
 "Q. Now you brought that in to me last week, is that not correct?
 "A. That's correct.
 "Q. Where was it obtained?
 "A. From my attorney.
 "Q. Is it an original or a copy?
 "A. It's a copy.
 "Q. Do you know where the original is?
 "A. It's somewhere in his office among his papers. He couldn't find it. Couldn't locate it.
 "Q. Was a search made for it?
 "A. Yes, it was.
 "Mr. Dimitri: I object to that, move to strike.
 "The Court: On what ground?
 "Mr. Dimitri: On the basis that he didn't do this himself. He didn't search for it. It's hearsay — I'll withdraw the objection, it's no (sic) consequence."
 [Tr. V.2, 431-432]
Such testimony gives one the impression that in July, 1986, when Raymond was testifying, the release which he had given two years before was now in the hands of an attorney who had been retained by Raymond. The Court did not then know, since it was never disclosed at trial, that Raymond had already filed his notification of suit the month before. Since the defendants treated this testimony as they did, considering it to be of "no consequence," the imputation is that the defendants knew about their pending exposure to civil damages but opted not to inject the matter for the jury's consideration. That strategy would be in tune with the Court's earlier hypothesis that the defendants had settled upon a plan to require the jury to make a choice between their veracity and the veracity of Knight, Williams and the Raymonds.
Speculation aside, the trial record and the record made on these motions, combined, demonstrate to the Court that the defendants had more time-efficient, productive and less convoluted evidence with which to attack Raymonds' testimony than the "fraudulent schemes evidence" which they wish to present at a new trial.
Before leaving this evidentiary attack upon the Raymonds and their role in the convictions of the defendants, the Court pauses to revisit a ruling made while this trial was on the verge of jury selection. It was disclosed to the Court during its consideration of pre-trial motions in limine that the defendants were in possession of a tape recording of a telephone conversation between officer Hainsworth and Raymond. As the prosecutor presented the state's objection to the use by the defendants of Raymond's statements, he informed the Court that Raymond had called the Glocester police station on two occasions seeking to speak with defendant Binns. Unsuccessful in both instances, on the second call Raymond spoke with officer Hainsworth instead. The prosecutor described the conversation in this fashion:
 "Your Honor, this led to a rather lengthy conversation between Sergeant Hainsworth and Mr. Raymond, in which Mr. Raymond said in sum and substance, and I think you may have to review what he said in camera, but that's up to you, it's perhaps 20 minutes of conversation, `I don't have anything against Mr. Binns. He may have whacked me a little bit, but Williams whacked me even more. I'm satisfied with what happened. I'm just a bit player in this drama, and I'm really not behind any of it. I have no hard feelings toward anyone.'"
The prosecutor proceeded to lay out the bases of his objection to the use of Raymond's statements and the following ensued:
 "THE COURT: Mr. Dimitri.
 "MR. DIMITRI: Your Honor, Mr. Raymond goes further in that tape and states, without equivocation, that this whole thing is a vendetta by Williams against these two police officers. That's what he says.
 "THE COURT: Can he say that?
 "MR. DIMITRI: Well the point is this —
 "THE COURT: He says it, but can he tell the jury that?
 "MR. DIMITRI: He's the nub around which this case revolves, if it please the Court. He's the reason why we're here, essentially.
 "THE COURT: Who's this, Raymond or Williams?
 "MR. DIMITRI: Raymond. There have been numerous conversations, numerous statements given by Raymond, not only to the State, to the Grand Jury, to his attorney, which they intend or want to use in evidence. This is rebuttal to that, your Honor, if it please the Court. And I think to deprive the defendants of utilizing that information would be totally unfair, your Honor. I think we would be denied a fair trial.
 "MR. NUGENT: If your honor heard this tape, your honor could conclude nothing other than the fact that it his highly inflammatory, misleading, conclusory and generally not evidence.
 "THE COURT: Mr. Nugent, bring the resources of your office to bear by preparing a transcript of the pertinent portions of the tape that relate to this case. * * * Tell me what Mr. Raymond had to say to Sergeant Hainsworth. Put that on paper. Give a copy to Mr. Dimitri, so that Mr. Dimitri can compare it next to the tape recording. If he's satisfied that it's been accurately reproduced, I can read the transcript.
 "MR. NUGENT: Yes, your Honor.
 "THE COURT: I will deny the motion pro forma. I take it that Mr. Raymond is going to be a witness.
 "MR. NUGENT: Yes, your Honor.
 "THE COURT: I will listen to the direct examination and, having been provided with a transcript of his telephone conversation with Sergeant Hainsworth, I'll be in a better position to know how far Mr. DiMitri can go, if you object, Mr. Nugent, at the appropriate time in his cross-examination."
 [Tr. V.1, 21-26]
As the Court's ruling shows, the door was left completely open to the defendants to obtain, during the cross-examination of Richard Raymond, an in-trial ruling on the admissibility of Raymond's statements to Hainsworth. The statements were never offered. If the statements were so damaging to Raymond that, as defense counsel argued, their exclusion would deny the defendants a fair trial, it must be deduced that the decision not to use the statements was the product of a cross-examination with which the defendants were content.
A final word on the Williams-Raymond linkage. What the Court has to say at this juncture is not related to the defendants' unflagging efforts to depict James Williams as a major, if not the major, source of their present unfortunate predicament. The defendants harbor the notion that there is something necessarily underhanded should Raymond have received "big money" from the defendants, including the instant defendants, in his civil rights suit with the help of Williams. What words were used, if any words were used at all, by Williams to express that thought to Raymond will never be known. But it cannot be gainsaid that Williams did assault Raymond. That fact appears in Williams' testimony. Every statement made by Raymond, of which the Court has been informed, regarding police treatment surrounding his arrest has included an accusation against Williams. In some instances, Raymond has said that Williams was the major aggressor. If that is true, Williams would be obliged under oath in the civil suit to admit it. If that is what Williams meant when he told Raymond that he would help Raymond get "big money" then Williams was acting with a salutory rather than an illicit purpose. For if Raymond's constitutional rights were violated by Williams and Binns and Williams testified truthfully to those facts, it goes without saying that Raymond would be entitled to damages. In the final analysis, however, if a malevolent spin is to be placed on a Raymond-Williams axis, it has an effect only upon a proceeding extraneous to the indictment upon which the defendants have been convicted.
 VI. Admissibility of Bressan and Lancia evidence. A. Raymond's statements that he stole the Ronci property and put them in his car.
1. Admissibility under R.I.R. Evid. 801(d)(1)(A)
If Richard Raymond were to testify at a second trial as he did in July, 1986, statements he is said to have made in 1988 to Bressan, Lancia and Gina Raymond that he was the person who broke into the Ronci home, stole some items and placed them in his car would be admissible as prior inconsistent statements. His 1986 testimony is substantially that his car was loaned to two juveniles and that he was at home during the time of the break.
2. Admissibility under R.I.R. Evid. 804(b)(3)
If Richard Raymond was unavailable as a witness at a second trial, his inculpatory statements would be admissible against him as a statement against interest subjecting him to criminal liability. Such statements have all the earmarks of common law burglary. The conduct of the malfeasor entailed the breaking and entry into the dwelling house of Fernando Ronci in the nighttime with the intent to commit a felony therein. There is no statute of limitations on the prosecution of common law burglary. If he admitted doing it, he would be subject to indictment.
 B. Raymond's statements that he intentionally fell down the stairs or did not otherwise sustain injuries.
Whether or not Raymond sustained any injuries in the course of his arrest and detention is irrelevant. That evidence is not admissible under either rule. The issue is whether he was assaulted by Binns. Any statement of his that he fell down the stairs on purpose and was not struck by Binns is directly in conflict with his trial testimony. While such evidence is admissible as a prior inconsistent statement it is not admissible, nevertheless, as a statement against his pecuniary interest no matter how much money he owed his attorney at the time he made the statement. It may have been admissible in the federal suit had the suit not been settled but not in the trial of this indictment.
 VII. Conclusion.
As a prelude to the examination and analysis of the record made on these motions for a new trial, the Court set out the tests to which it would hew as those tests were expressed for the Supreme Court by Mr. Justice Paolino in State v. Carsetti,supra. Each of the tests must be met by a movant. The Court has evaluated the record in relation to the particular arguments and has concluded in the course of this decision that in one aspect or another one or more of the standards has not been met.
The motion of each defendant for a new trial on the ground of newly discovered evidence is denied and dismissed.
Each defendant shall appear before the Court's clerk in Courtroom No. 10 on the 1st day of April, 1991 at 10:00 A.M. for execution of sentence.